**Robert and Olga OSTERBERG, Petitioners,**

v.

**Peter S. PECA, Jr., Respondent.**

**No. 97–1027.**

Supreme Court of Texas.

Argued Sept. 8, 1998.

Decided Feb. 3, 2000.

Concurring Opinion by Justice Gonzales, Feb. 8, 2000.

Larry Zinn, San Antonio, John L. Hoestenbach, Odessa, for Petitioners.

Michael R. "Mick" Milligan, El Paso, for Respondent.

Justice ABBOTT delivered the opinion of the Court with respect to parts I–IV and VI–XI, in which Justice HECHT, Justice OWEN, Justice BAKER and Justice GONZALES join, and a plurality opinion with respect to part V, in which Justice HECHT, Justice OWEN, Justice BAKER join.

We overrule the Osterbergs' motion for rehearing. We withdraw our opinion dated July 29, 1999, and substitute the following.

In this case we conclude that a candidate who seeks to enforce Texas Election Code reporting requirements is not required to prove that persons making unreported expenditures against the candidate knew they were breaking the law. Arriving at that conclusion requires us to decide the constitutionality of the Election Code sections imposing reporting requirements on direct campaign spenders and the Election Code sections providing private civil remedies for reporting violations. We conclude that, as applied to the Osterbergs, the reporting requirements and the private civil enforcement provisions pass constitutional muster, with one exception: We hold that the Election Code's requirement that husband and wife Robert and Olga Osterberg form a political committee before acting in concert to make a campaign expenditure unconstitutionally burdens their freedom of association. Accordingly, we affirm in part and reverse in part the court of appeals' judgment and remand to the court of appeals.

## I

## FACTS

In 1991, Robert Osterberg and his wife Olga were involved in litigation in State District Judge Peter Peca's court. The Osterbergs were unhappy with the way Peca treated them during the litigation. When Peca ran for re-election in 1994, the Osterbergs opposed his candidacy. They contributed $34,200 to Albert Biel, Peca's opponent in the Democratic primary. The Osterbergs also created and funded their own television advertisements about the race.[1] The advertisements consisted of the following text:

CONSIDER THIS:
- Judge Peca was chosen by his peers El Paso's outstanding jurist
- He graduated Summa Cum Laude
- He worked to reduce his docket for over seven years

IF THAT'S ENOUGH, VOTE FOR HIM

[next screen:]

---

1. The parties contest whether Olga made expenditures for the advertisement. For simplicity's sake, we refer to the expenditure and the advertisement as "the Osterbergs.'" Our label is not intended to be a substantive comment.

But, if you want ONE who understands:

- The Courthouse exists for the people, and not for judges, accidents of politics, and lawyers.
- The spirit of the law, not just the letter, must be employed for justice and the people.
- Efficiency at the expense of justice cannot be tolerated.

BRING THE COURTHOUSE BACK TO THE PEOPLE!

VOTE FOR HIS OPPONENT

And remove HIM in four years

If he fails the will of the people!

Ad paid for by Bob Osterberg

The Osterbergs spent $28,695 to produce and air the advertisement. The money was withdrawn from a bank account Robert and Olga shared, with checks that Olga had signed in her name. Robert testified that Olga knew nothing about his payment for the ads, and that he used checks she had signed for his use because he had suffered a stroke that impaired his right hand.

One month before the March 8, 1994 primary election, Peca spoke at an El Paso Bar Association candidate forum luncheon. Biel attended the luncheon and heard Peca speak. Biel understood some of Peca's remarks to be accusations that Osterberg was somehow violating the Texas Election Code. At trial, Biel testified that he told Osterberg about Peca's remarks, though he did not say when.

Peca won the March 8th primary election. Two days later, he filed suit against the Osterbergs seeking civil damages for violations of the Texas Election Code. An opposing candidate can bring a private cause of action against "[a] person who knowingly . . . makes a campaign expenditure in violation of" Chapter 253. TEX. ELEC.CODE § 253.131. Peca claimed that the Osterbergs violated Chapter 253 of the Election Code by failing to report the direct campaign expenditures they made for the television advertisements. Chapter 253 prohibits direct campaign expenditures over $100 unless the spender reports the expenditures in compliance with Election Code Chapter 254.[2] The Osterbergs had not reported the expenditures by the deadlines required by Election Code section 254.124. Under section 254.124, the Osterbergs were required to file a report no later than the eighth day before the election. Robert did not file a report until May 4, 1994—nearly two months after the election and after Peca had filed suit. Following a jury trial, the trial court held Robert and Olga jointly and severally liable for Election Code violations and awarded Peca $57,390 plus interest.

The court of appeals affirmed in part and reversed in part. 952 S.W.2d 121. It held that Peca was required to prove that

2. TEX. ELEC.CODE §§ 253.002, 253.062. What Chapter 253 defines as a "direct campaign expenditure" corresponds with what the Federal Election Campaign Act and United States Supreme Court call an "independent expenditure." Compare TEX. ELEC.CODE § 251.001(7), (8) (defining a "direct campaign expenditure" as an expenditure made "in connection with a campaign for elective office or on a measure" that "does not constitute a campaign contribution"), and 1 TEX. ADMIN. CODE § 20.1 (direct campaign expenditure is "made without the prior consent or approval of the candidate or officeholder on whose behalf the expenditure was made"), with Federal Election Campaign Act, 2 U.S.C. § 431(17) (1997) (defining an "independent expenditure" as "an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate" or candidate's agent or committee), and Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 609, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (clarifying that an "independent" expenditure is an expenditure "not coordinated with the candidate or candidate's campaign"). See generally Op. Tex. Ethics Comm'n No. 336 (1996) ("Although the term 'independent campaign expenditure' is not used in Texas law, it is often more easily grasped than the term 'direct expenditure,' which Texas law uses to describe a campaign expenditure made without the prior consent or approval of the candidate benefitted.").

the Osterbergs knew their expenditures violated the Election Code. *Id.* at 126. Applying that standard, it affirmed the trial court's judgment against Robert, finding evidence that Robert knew he was violating the Election Code. *Id.* at 128. The court of appeals reversed as to Olga because it found there was no evidence that she knowingly violated the Election Code. *Id.* Because of this reversal, the court did not address the Osterbergs' argument that there was no evidence or insufficient evidence that Olga made a direct campaign expenditure. *Id.* at 129. The court of appeals also held that the Osterbergs had waived their constitutional objections to Chapter 253's reporting requirement and civil enforcement provision. *Id.* at 124–25. The court of appeals further held that the Osterbergs waived their constitutional argument that the trial court should have limited its definition of "campaign expenditure" to expenditures for communications that "expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 129–31. And the court of appeals held that the Osterbergs waived their contention that they "substantially complied" with the Election Code's reporting requirements by filing a report on May 4, 1994—almost two months after the election. *Id.* at 129. Finally, the court of appeals held that Peca waived recovery of attorney's fees by failing to object or make a new request when the jury did not return a finding on the attorney's fees issue. *Id.* at 132.

Both the Osterbergs and Peca petitioned this Court for review. The Osterbergs renew their argument that Peca produced no evidence that Robert Osterberg knowingly violated Chapter 253 and contend that they did not waive their constitutional and substantial compliance arguments. In response, Peca argues that the Election Code does not require him to prove the Osterbergs knew that their expenditure violated the Election Code, and alternatively that if the Election Code does require knowledge of the law, the evidence

supports such a finding. Peca also argues that he is entitled to attorney's fees.

We hold that: (1) Peca need not prove the Osterbergs' subjective knowledge of election laws; (2) the Osterbergs preserved their constitutional objections to Chapter 253; (3) the statute's de facto requirement that the Osterbergs form a political committee and designate a treasurer before making expenditures "in concert" unconstitutionally burdens their associational rights; (4) the application of Chapter 253's other provisions to the Osterbergs does not violate the free speech or association provisions of the Texas or United States Constitutions; (5) the Osterbergs did not waive their constitutional objection to the trial court's definition of campaign expenditure, but any error by the trial court in its instruction was harmless because the Osterbergs' advertisement was express advocacy as a matter of law; (6) the Osterbergs waived their defense that they substantially complied with the statute; and (7) Peca waived his claim for attorney's fees. Our holding renders irrelevant Peca's alternative argument that the evidence supports a finding that the Osterbergs knowingly violated the statute.

## II

## WHAT MUST A VIOLATOR KNOW?

Texas Election Code section 253.131(a) provides:

> A person who *knowingly* makes or accepts a campaign contribution or makes a campaign expenditure in violation of this chapter is liable for damages as provided by this section.

TEX. ELEC.CODE § 253.131(a) (emphasis added). The initial question in this case is whether this section requires Peca to prove that the Osterbergs actually knew that their conduct violated Chapter 253. The trial court and court of appeals held that the word "knowingly" applies not only to the act of making a campaign expenditure, but also to the fact that the expenditure violates the Election Code. Peca

assails this construction of the statute, arguing that it violates the "deeply rooted" rule that ignorance or mistake of law is not a defense to prosecution. Peca contends that allowing ignorance or mistake of law as a defense would vitiate enforcement of the Election Code's campaign finance provisions.

In construing a statute, our primary aim is to give effect to the Legislature's intent. *Texas Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex.1996). We endeavor to discern the Legislature's intent from the actual language it used. *Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 438 (Tex. 1997). In so doing, we consider the object to be attained, the circumstances surrounding the statute's enactment, legislative history, former statutory and common law, and the consequences of a particular construction. TEX. GOV'T CODE § 311.023; *Mitchell Energy*, 943 S.W.2d at 438; *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex.1994).

The language of section 253.131(a), as well as the language and structure of the Election Code, demonstrate the Legislature's intent that "knowingly" refer only to the act of making or accepting a contribution or expenditure and not to whether the contribution or expenditure violated the Election Code. The Legislature made clear in other sections of the Election Code when it specifically wanted to require a person to know the law is being violated. *See, e.g.,* TEX. ELEC.CODE § 253.003(b) ("A person may not *knowingly* accept a political contribution *the person knows to have been made in violation of this chapter*.") (emphasis added); § 253.005(a) ("A person

may not knowingly make or authorize a political expenditure wholly or partly from a political contribution *the person knows to have been made in violation of this chapter*.") (emphasis added). The Legislature clearly knew how to require that the actor have knowledge of the Election Code before being charged with a violation. Because the Legislature did not include a similar knowledge requirement in section 253.131, we should not presume to add that requirement ourselves.[3]

As Peca contends, adding such a requirement would hamper section 253.131's purpose by undermining its enforceability. *See Ragsdale v. Progressive Voters League*, 790 S.W.2d 77, 84 (Tex.App.— Dallas) ("The enforcement of this remedy is the essence of the statute and promotes compliance with the provisions of the Code, especially those that proscribe certain acts as being unlawful."), *aff'd in part and rev'd in part on other grounds*, 801 S.W.2d 880 (Tex.1990). Enforcement would be problematic because future cases would focus on whether the defendant knew the specific code provisions, and whether the defendant operated under a correct legal interpretation. A defendant could avoid civil enforcement simply by refusing to learn the election laws. The resulting rule would do violence to the general proposition that ignorance of the law is not a defense. *See* TEX. PEN.CODE § 8.03(a) ("It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."). We conclude that neither the statute's language nor the Election Code's structure reveals an intent by the Legislature to deviate from that proposition.[4]

---

**3.** The dissent claims that our interpretation of section 253.131 and other Election Code provisions "produces the ironic result that only *candidates* like Judge Peca are protected from civil liability when unaware that they are violating the Election Code, while *ordinary citizens* like Mr. and Mrs. Osterberg can be liable (emphasis original)." The dissent supplies no authority or support for that bald assertion.

**4.** The dissent argues that this construction makes ignorance of the law a defense for candidates, but not for private parties. To the contrary, our construction provides no rationale for allowing a candidate to use ignorance of the law to avoid liability for making illegally unreported expenditures. Moreover, it is within the Legislature's province, not ours, to establish the degree of knowledge necessary to violate a statute.

■ Instead, we hold that in section 253.131, "knowingly" applies only to whether a person is making a "campaign contribution" or "campaign expenditure." Under this construction, an inquiry into whether there is evidence that Robert or Olga Osterberg knew they were violating election laws is unnecessary, and the court of appeals erred in making that inquiry. With respect to Robert, that error is harmless because the court of appeals' conclusion on the issue did not cause it to reverse Peca's judgment against Robert. 952 S.W.2d at 128. However, the court of appeals committed reversible error when it reversed Peca's judgment against Olga after finding no evidence that she knew she was violating the law. On remand, the court of appeals should address the Osterbergs' alternative argument that Peca produced no evidence or insufficient evidence that Olga knowingly made a direct campaign expenditure.

## III

## PRESERVATION OF CONSTITUTIONAL CHALLENGES TO THE STATUTE

Before considering the constitutionality of the statute, we first consider whether the Osterbergs waived their constitutional arguments. In their amended answer, the Osterbergs argued that "allowance of damages sought by Plaintiff ... would violate the freedom of speech and association clauses of the U.S. and Texas Constitutions." In their motion for directed verdict, the Osterbergs reiterated that "[i]mposing the restrictions of the reporting and expenditure requirements of a specific political committee, along with the accompanying penalties, on your Defendants would be a violation of the free speech and asso-

ciation clauses of the United States and Texas Constitutions," and explained that "[t]hese restrictions burden the exercise of political speech and are not narrowly enough focused to serve a compelling interest of the state." In their motion to modify judgment and alternative motion for new trial the Osterbergs again raised these issues, stating that "Chapter[s] 253 and 254 of the Texas Election Code, as applied to this case, are not narrowly tailored to serve an overriding state interest and are therefore in violation of the free speech and association clauses of the U.S. and Texas Constitutions." These post-verdict motions also alleged, for the first time, that the phrase "acting in concert with one or more persons"[5] is unconstitutionally vague.

The Osterbergs asserted these constitutional defenses in four points of error on appeal. The court of appeals ruled that the Osterbergs waived their constitutional arguments because they asserted only "broadly stated allegations, unsupported by further argument or evidence," which "were insufficient to call the multiple specific constitutional challenges ... to the attention of the trial court." 952 S.W.2d at 125. The court of appeals also held that the Osterbergs could not raise their vagueness challenges for the first time in post-verdict motions. *See id.* (citing *McCraw v. Vickers,* 717 S.W.2d 738, 741 (Tex.App.— San Antonio 1986, writ ref'd n.r.e.)). The Osterbergs argue that the court of appeals erred in holding that they waived their First Amendment arguments. We agree.

■ When deciding if a party has waived its federal constitutional claims in state court, we look first to Texas's procedural rules that govern when a party must raise those claims.[6] If we conclude that

---

5. The relevant provision of the Texas Election Code actually states: "Except as otherwise provided by law, an individual *not acting in concert with another person* may make one or more direct campaign expenditures in an election from the individual's own property that exceed $100 on any one or more candi-

dates or measures...." Tex. Elec.Code § 253.062(a) (emphasis added).

6. *See* Tex.R.App. P. 33.1(a) ("As a prerequisite to presenting a complaint for appellate review, the record must show that ... the complaint was made to the trial court by a timely request, objection, or motion...."); *Dreyer v.*

waiver has occurred under those rules, we then consider whether those procedural grounds are adequate as a matter of substantive federal constitutional law to protect the constitutional interests at stake. *See, e.g., Lawrence v. State Tax Comm'n,* 286 U.S. 276, 282, 52 S.Ct. 556, 76 L.Ed. 1102 (1932) ("Even though the claimed constitutional protection be denied on non-federal grounds, it is the province of this Court to inquire whether the decision of the state court rests upon a fair or substantial basis.").

Applying Texas procedural rules, we consider whether the Osterbergs raised their federal free speech and association arguments with sufficient specificity to give the trial court an opportunity to rule on the issues. *See* TEX.R.APP. P. 52(a) (Tex. Sup.Ct. and Tex.Crim.App.1986, amended 1988, 1989, 1990, superseded 1997) ("In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context.");[7] *McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72, 74 (Tex.1989); *see also In the Interest of Shaw,* 966 S.W.2d 174, 182 (Tex.App.—El Paso 1998, no pet.) ("The purpose of the requirement that a

specific objection be lodged in the trial court is to ensure that the trial court has the opportunity to rule on the issue.").

In their answer and their motion for directed verdict, the Osterbergs identified the constitutional rights at issue and the statutory provisions that, when applied, allegedly violate them. Although the statements in the pleading and motion were not paragons of specificity, they nevertheless identified for the trial court the issue to be ruled on and provided the trial court the opportunity to rule. We hold that the Osterbergs did not waive their First Amendment defenses to the application of Chapter 253. Concern for protecting First Amendment rights also supports this holding. When freedom of speech is at issue, the Supreme Court will find waiver only in circumstances that are "clear and compelling." *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This case does not provide "clear and compelling" circumstances to justify finding that the Osterbergs' First Amendment arguments are waived.

Although we decide the extent to which the United States Constitution protects the Osterbergs' conduct, we do not consider the extent to which the Texas Constitution provides an independent basis

---

*Greene,* 871 S.W.2d 697, 698 (Tex.1993) ("As a rule, a claim, including a [federal] constitutional claim, must have been asserted in the trial court in order to be raised on appeal."). *See generally John v. Paullin,* 231 U.S. 583, 585, 34 S.Ct. 178, 58 L.Ed. 381 (1913) ("Without any doubt it rests with each State to prescribe the jurisdiction of its appellate courts, the mode and time of invoking that jurisdiction, and the rules of practice to be applied in its exercise; and the state law and practice in this regard are no less applicable when Federal rights are in controversy than when the case turns entirely on questions of local or general law."), *quoted in Wolfe v. North Carolina,* 364 U.S. 177, 195, 80 S.Ct. 1482, 4 L.Ed.2d 1650 (1960); TRIBE, AMERICAN CONSTITUTIONAL LAW § 3–24 at 166 (2d ed. 1988) ("Of necessity, state procedural law determines the manner in which a federal question is to be presented in state court, unless

federal substantive law defines its own procedural matrix.... More dramatically, a litigant's failure to comply with state procedures may cause a state court to rule against the litigant without ever reaching the merits of the litigant's federal claim."); 16B CHARLES A. WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4022 at 343 (2d ed. 1996) ("The accepted rule is that a state court establishes an independent and adequate state ground, barring Supreme Court review, by refusing to consider a federal question that was presented by means that do not comply with established and reasonable state procedures.").

7. In 1997, Rule 52(a) was rewritten as Rule 33.1. Because the Osterbergs filed their appeal in 1995, Rule 52(a) governs their preservation.

for protection because the Osterbergs furnished argument and authority only under the United States Constitution. Though "noting" that the Texas Constitution may provide broader free speech protections, the Osterbergs stated in their brief that "[b]ecause the judgment here is unconstitutional under the U.S. Constitution, it is not necessary to determine the independent ground of whether it is unconstitutional under the Texas Constitution." The Osterbergs thus provide no rationale to support a conclusion based on the Texas Constitution that differs from what the Federal Constitution allows. We thus consider only the Osterbergs' First Amendment arguments. *See In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 375 n. 4 (Tex.1998) (declining to consider whether the Texas Constitution provides an independent basis for protection); *Tilton v. Moye,* 869 S.W.2d 955, 956 n. 2 (Tex.1994) (same).

## IV

### DOES CHAPTER 253 ACT TO PROHIBIT INDEPENDENT EXPENDITURES, OR DOES IT REASONABLY REQUIRE DISCLOSURE OF THOSE EXPENDITURES?

The Osterbergs challenge the constitutionality of applying Chapter 253's strictures to their "core First Amendment activity." They assert that Chapter 253 erects an unconstitutional prohibition on direct expenditures, and that the statute's constitutionality is not saved by its exception allowing an individual to make direct expenditures if that individual files the required reports. Peca responds that Chapter 253 comports with the Constitution in imposing a requirement that an individual making a direct expenditure report that expenditure. We agree with Peca.

The landmark case *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and cases that followed, provide the principles that govern our constitutional analysis. Although *Buckley* addressed only whether federal campaign finance statutes complied with the First Amendment, its holdings apply equally to our inquiry into whether this state statute complies with the First Amendment as incorporated through the Fourteenth Amendment's Due Process Clause. *See Suster v. Marshall,* 149 F.3d 523, 529 (6th Cir.1998) ("Review of the constitutionality of spending limits in *Buckley* was not based upon the line of reasoning that such limitations should apply only to federal political campaigns."), *cert. denied,* —— U.S. ——, 119 S.Ct. 890, 142 L.Ed.2d 788 (1999); *Kruse v. City of Cincinnati,* 142 F.3d 907, 913 (6th Cir.) (finding no support for the contention that states have more latitude than the federal government in regulating the First Amendment expression of its citizens), *cert. denied,* —— U.S. ——, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998).

In *Buckley,* the United States Supreme Court explained that expenditure limitations "operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley,* 424 U.S. at 14, 96 S.Ct. 612. Following this rationale, the Supreme Court has struck down bans or ceilings on independent campaign expenditures because they

> significantly impair the ability of individuals and groups to engage in direct political advocacy and "represent substantial ... restraints on the quantity and diversity of political speech." And at the same time, the Court has concluded that limitations on independent expenditures are less directly related to preventing corruption, since "[t]he absence of prearrangement and coordination of an expenditure with the candidate ... not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for

improper commitments from the candidate."

*Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n,* 518 U.S. 604, 615, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (citations omitted). Consequently, if Chapter 253 is construed as banning or placing a ceiling ·on independent expenditures, it will not survive the heightened scrutiny that the First Amendment requires. *See id.* at 618, 116 S.Ct. 2309 (striking down a state ban on independent expenditures by political parties).

■ In contrast to its treatment of laws banning independent expenditures, *Buckley* held that, at least facially, the federal reporting requirements for independent expenditures over $100 in candidate elections bore a sufficient relationship to a substantial governmental interest. *Buckley,* 424 U.S. at 80, 96 S.Ct. 612. The Court explained that in addition to preventing corruption, the reporting requirements "shed the light of publicity on spending that is unambiguously campaign related but would not otherwise be reported because it takes the form of independent expenditures," and disclosure advances a strong "informational interest" because it "helps voters to define more of the candidates' constituencies." *Id.* at 81, 96 S.Ct. 612; *see Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"); *Buckley v. American Constitutional Law Found., Inc.,* 525 U.S. 182, 119 S.Ct. 636, 657, 142 L.Ed.2d 599 (1999) (O'Connor, J., concurring in part and dissenting in part) ("Total disclosure has been recognized as the essential cornerstone to effective campaign finance reform, and fundamental to the political. system.") (internal quotations and citations omitted). A requirement that a spender report the amount and use of money spent in candidate elections is thus "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic process-

es of [the] election system to public view." *Buckley,* 424 U.S. at 82, 96 S.Ct. 612.

■ However, in *Buckley,* 424 U.S. at 74, 96 S.Ct. 612, and in *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 356 n. 21, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court noted that while the federal reporting requirements may be constitutional on their face, they may not be constitutional as applied if disclosure could reasonably subject the· spender to threats, harassment, or reprisals from government officials or private parties. The Court has also distinguished independent expenditure reporting requirements applied to candidate elections or lobbyists from reporting requirements applied to ballot measures. *McIntyre,* 514 U.S. at 356 & n. 20, 115 S.Ct. 1511. *But cf. Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 299–300, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (stating in dicta, in the context of a ballot measure, that "[t]he integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions"). Thus, if· Chapter 253 operates only to impose reporting requirements on independent expenditures over $100, as applied to a candidate election in which no reasonable fear of reprisals has been demonstrated, it should comport with the constitutional guidelines established in *Buckley* and *McIntyre.*

■ With these principles in mind, we consider whether, as applied to the Osterbergs, Texas Election Code sections 253.002 and 253.062 act as a ban on independent expenditures or instead impose a reporting requirement. Section 253.002, which calls an independent expenditure a "direct campaign expenditure," provides:

(a) A person may not knowingly make or authorize a direct campaign expenditure.

(b) This section does *not* apply to:

(1) *an individual making an expenditure authorized by Subchapter C;*

(2) a corporation or labor organization making an expenditure authorized by Subchapter D;

(3) a candidate making or authorizing an expenditure for the candidate's own election;

(4) a political committee; or

(5) a campaign treasurer or assistant campaign treasurer acting in an official capacity.

TEX. ELEC.CODE § 253.002(a), (b) (emphasis added). Under Subchapter C, which provides requirements for direct expenditures by individuals, section 253.062 states:

(a) Except as otherwise provided by law, an individual not acting in concert with another person may make one or more direct campaign expenditures in an election from the individual's own property that exceed $100 on any one or more candidates or measures if:

(1) the individual complies with Chapter 254[8] as if the individual were a campaign treasurer of a political committee; and

(2) the individual receives no reimbursement for the expenditures.

TEX. ELEC.CODE § 253.062(a).

The initial phrase of section 253.002 appears to be a complete ban on direct campaign expenditures. But subsection (b) clarifies that section 253.002's prohibition does not apply so long as the spender follows other separate requirements. If the spender is an individual who is not a candidate or campaign treasurer, section 253.002 construed with Subchapter C provides the following rule: unlimited direct expenditures are allowed as long as the spender reports expenditures that exceed $100 in an election and no one reimburses the spender. *See* TEX. ELEC.CODE §§ 253.061, 253.062. Though complexly phrased and structured, the Election Code has an unambiguous intended effect: an individual must report direct expenditures that total over $100 or the unreported expenditures become illegal and the spender may face civil and criminal penalties; if the spender reports the expenditures, he or she faces no penalties. As Peca argues, these provisions operate to impose a reporting requirement on direct campaign expenditures, rather than a ban or ceiling on those expenditures.

Under section 253.062 as interpreted by the Texas Ethics Commission, an individual cannot receive reimbursement for direct campaign expenditures, and the individual must report expenditures totaling over $100 as if that individual were a campaign treasurer of a specific-purpose political committee. *See* 1 TEX. ADMIN. CODE § 22.5. Election Code Chapter 254 and Chapter 20, subchapter E of the Ethics Commission's rules establish the requirements for these reports. In this contested judicial election, the Osterbergs [9] were required to file a report listing their direct campaign expenditures by the eighth day before the primary election. *See* TEX. ELEC.CODE § 254.124; 1 TEX. ADMIN. CODE § 20.325.[10] Because the race was for the 171st Judicial District, composed only of El Paso County,[11] the Osterbergs were required to file the report with the El Paso

---

8. Chapter 254 requires reporting of contributions and expenditures and provides reporting schedules.

9. For simplicity's sake, we refer to "the Osterbergs." However, Olga was required to meet the Election Code's reporting requirements only if she knowingly made an expenditure.

10. The Osterbergs were not required to file a report thirty days before the election because they had made no direct campaign expenditures as of the fortieth day before the election. TEX. ELEC.CODE § 254.124(b). Election Code section 254.123 also requires specific-purpose political committees to file semiannual reports on July 15 and January 15. Whether the Osterbergs were required to file these semiannual reports we need not, and thus do not, decide.

11. TEX. GOV'T CODE § 24.266(a).

County Clerk. *See* TEX. ELEC.CODE §§ 252.005(2), 252.006, 254.130; 1 TEX. AD-MIN. CODE § 20.5. The report must be sworn,[12] placed on the Ethics Commission-prescribed form,[13] and must include: (1) the name, address, and telephone number of the spender;[14] (2) the date and type of election for which the report is filed;[15] (3) the amount of direct campaign expenditures that in aggregate exceed $50 during the reporting period;[16] (4) the full name and address of the persons to whom those expenditures are made;[17] (5) the dates and purposes of the expenditures;[18] and (6) the name of and office sought by each candidate or officeholder benefitting from each direct campaign expenditure.[19] The Osterbergs were also required to give notice to Biel if their direct campaign expenditures supported him. *See* TEX. ELEC. CODE § 254.128(a), (b); Op. Tex. Ethics Comm'n No. 331 (1996). *See generally* TEXAS ETHICS COMM'N, CAMPAIGN FINANCE GUIDE FOR POLITICAL COMMITTEES (1997).

Because in a candidate election the ultimate burden of these requirements is substantially similar to that of the federal reporting requirements,[20] they fall into the genus of requirements that *Buckley* upheld as "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of [the] election system to public view." *Buckley*, 424 U.S. at 82, 96 S.Ct. 612. We therefore conclude that the reporting requirements that Chapter 253 placed on the Osterbergs did not violate their First Amendment rights.

## V

The dissent argues that "knowingly" in section 253.131(a) must modify more than the act of making a campaign expenditure because "spending money on core First Amendment speech cannot, in and of itself, be against the law—there must be some-

12. TEX. ELEC.CODE § 254.036(b); 1 TEX. ADMIN. CODE § 20.331(24).

13. TEX. ELEC.CODE § 254.036(a); 1 TEX. ADMIN. CODE § 20.19. Today, the Osterbergs may have to file their reports on Ethics Commission Form JSPAC, because the Judicial Campaign Fairness Act would apply. However, the election at issue occurred before the Act was passed in 1995, so it does not apply in this case.

14. TEX. ELEC.CODE § 254.121(2); 1 TEX. ADMIN. CODE § 20.331(3), (4), (5).

15. TEX. ELEC.CODE § 254.121(3); 1 TEX. ADMIN. CODE § 20.331(6).

16. TEX. ELEC.CODE § 254.031(a)(3); 1 TEX. ADMIN. CODE § 22.331(22)(E). Although an individual must report expenditures if they exceed $50 in a reporting period, this requirement is not triggered until the individual has spent over $100 in aggregate on the candidate. TEX. ELEC.CODE § 253.062(a).

17. TEX. ELEC.CODE § 254.031(a)(3); 1 TEX. ADMIN. CODE § 20.331(18).

18. TEX. ELEC.CODE § 254.031(a)(3); 1 TEX. ADMIN. CODE § 20.331(18).

19. TEX. ELEC.CODE § 254.031(a)(7); 1 TEX. ADMIN. CODE § 20.331(19).

20. Under the Federal Election Campaign Act, every person, other than a political committee, making independent expenditures exceeding $250 in a year must: In an election year, file a pre-election report no later than twelve days before any election, file a post-general election report no later than thirty days after the general election, and file additional quarterly reports. *See* 2 U.S.C. § 434(a)(2), (c). In a non-election year, the person must file bi-annual reports. *See id.* In addition, any independent expenditure greater than $1000 and made after the twentieth day before any election must be reported to the Secretary of the *Federal Election Commission* and the Secretary of State within 24 hours of when that expenditure is made. *See* 2 U.S.C. § 434(c)(2). The reports must include: the name of persons who receive any disbursement during the reporting period in an aggregate amount over $200 within the calendar year; the date, amount, and purpose of the expenditure; a statement whether the expenditure is in support of or opposition to a candidate; the name of and office sought by the candidate; and a certification whether the independent expenditure is made in cooperation, consultation, or concert with, or at the *request or suggestion of,* any candidate or candidate's committee or agent. *See* 2 U.S.C. § 434(b)(6)(B)(iii), (c)(2).

thing more." Analogizing to *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 73–74, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), the dissent states that the "something more" required by the Constitution "happens to be the fact that the expenditure had to be reported." The *X–Citement* decision does not, however, support the dissent's or the Osterbergs' argument. *X–Citement* stands for the proposition that a person must be aware of engaging in certain conduct—not aware of violating a particular statute—before being punished for conduct that would otherwise be protected by the First Amendment. For example, the defendants in *X–Citement* could not have been prosecuted for simply transporting pornographic materials, the subjects of which were all adults, across state lines, because that activity is protected under the First Amendment. "[T]he age of the performers [in the pornographic materials] is the crucial element separating legal innocence from wrongful conduct." *X–Citement*, 513 U.S. at 73, 115 S.Ct. 464. Thus, under the statute in that case, something more than knowing that one was transporting pornographic materials across state lines had to be proved in order for otherwise protected speech to be punished, namely that the pornographic materials contained minor children. In short, the *X–Citement* Court held that the defendant had to have knowledge that the pornographic subjects were minors, not that transporting child pornography was against the law. Applying the dissent's and the Osterbergs' reasoning, the *X–Citement* defendants would also have to know that transporting child pornography violated the law.

 The correct application of *X–Citement* requires only that the Osterbergs were aware that they made a direct campaign expenditure. Although the statute does not say so, an argument could be made that, in order for the statute to be upheld as constitutional, the Osterbergs also had to know that they did not report the expenditures. The Osterbergs were aware of all of these facts. The statute does not require, however, that the Oster-

bergs knew of the statute they were violating. As such, section 253.151(a) does not punish innocent First Amendment activity; the statute punishes only those who do not report that they have engaged in otherwise innocent First Amendment activity. In other words, section 253.131(a) does not violate the Osterbergs' First Amendment rights because the statute does not prevent them from making a campaign expenditure. The statute merely requires that they report their campaign expenditures, and, to reiterate, reporting requirements are clearly constitutional. *See Buckley v. Valeo*, 424 U.S. 1, 84, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). While the statute may be unpalatable, it is not unconstitutional and should not be judicially rewritten as suggested by the dissent.

Another flaw in the Osterbergs' and the dissent's analysis is that it applies a myopic view of the First Amendment interest at stake in this case. While it is true that the Osterbergs have a First Amendment right to engage in political speech, it is also true that a law requiring disclosure promotes the ends of the First Amendment. As previously noted, "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution," *Buckley*, 424 U.S. at 14, 96 S.Ct. 612, and disclosure advances a strong "informational interest" because it "helps voters to define more of the candidates' constituencies." *Id.* at 81, 96 S.Ct. 612. The dissent's interpretation and application of section 253.131(a) would likely result in less reporting of expenditures like that made by the Osterbergs, thus shielding vital information about the elective process from the public.

## VI

## MUST A HUSBAND AND WIFE FILE AS A POLITICAL COMMITTEE BEFORE MAKING DIRECT CAMPAIGN EXPENDITURES "IN CONCERT"?

 Election Code section 253.062 allows individuals to make direct campaign

expenditures as long as those expenditures are lawfully reported and unreimbursed. However, section 253.062's authorization is limited to "an individual *not acting in concert with another person.*" TEX. ELEC. CODE § 253.062(a) (emphasis added). The Osterbergs contend that this limitation "clearly violates the association clause of the First Amendment." They cite *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 296, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), in which the Court stated:

> There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them. To place a Spartan limit—or indeed any limit—on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association.

Though the Osterbergs mistakenly refer to an "association clause" in the First Amendment, it is clear they seek to assert their right to freely associate, which is instrumental to the First Amendment's free speech, assembly, and petition guarantees. We hold that because section 253.062 allows the Osterbergs' lawfully reported direct campaign expenditures only when they, husband and wife, are "not acting in concert with" one another, it unconstitutionally infringes upon their right to freely associate.

In imposing reporting requirements on individuals who make direct campaign expenditures, Election Code Chapter 253 distinguishes between those individuals who act alone and those who act in concert with others. If an individual acts alone, that individual need not report direct campaign expenditures that amount to $100 or less. TEX. ELEC.CODE § 253.061; 1 TEX. ADMIN. CODE § 22.5(b)(1). If an individual acting alone makes direct campaign expenditures exceeding $100, the individual must comply with all applicable reporting requirements for a specific-purpose political committee,

save two: the individual need not form a committee nor file a campaign treasurer appointment. TEX. ELEC.CODE § 253.062; 1 TEX. ADMIN. CODE § 22.5(b)(2), (c). However, if an individual acts in concert with another, the individuals must form a political committee, appoint a campaign treasurer, and file that appointment with the appropriate authority before making direct campaign expenditures that exceed $500. *See* TEX. ELEC.CODE §§ 252.001, 253.002(b), 253.031(b); 1 TEX. ADMIN. CODE § 22.1; Op. Tex. Ethics Comm'n No. 331 (1996). The issue thus boils down to whether the Osterbergs' associational rights are unconstitutionally burdened if they are required to form a political committee and file a treasurer appointment before they make direct expenditures in concert.

In *Roberts v. United States Jaycees,* 468 U.S. 609, 617–23, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court described two "distinct senses" of constitutionally protected freedom of association. *Id.* at 617, 104 S.Ct. 3244. In one line of decisions, the Court has recognized that

> certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State.

*Id.* at 618–19, 104 S.Ct. 3244 (citations omitted); *see generally* Karst, *The Freedom of Intimate Association,* 89 YALE L.J. 624 (1980). These protected personal affiliations include marriage. *See Roberts,* 468 U.S. at 619, 104 S.Ct. 3244; *Zablocki v. Redhail,* 434 U.S. 374, 383–86, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Constitution protects these affiliations for intrinsic reasons, "as a fundamental element of personal liberty." *Roberts,* 468 U.S. at 618, 104 S.Ct. 3244.

■ In a second line of decisions, "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment," because "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 618, 622, 104 S.Ct. 3244. This right of association is a "basic constitutional freedom" that, "like free speech, lies at the foundation of a free society." *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting *Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), and *Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)). Infringement upon this type of freedom to associate—the type that is instrumental to protecting First Amendment freedoms—is subject to the closest scrutiny. The State must demonstrate a compelling or overriding interest "and employ[ ] means closely drawn to avoid unnecessary abridgement." *Buckley,* 424 U.S. at 25, 96 S.Ct. 612; *see also Roberts,* 468 U.S. at 623, 104 S.Ct. 3244.

This case implicates both types of associational interests. Applied to the Osterbergs, Chapter 253 imposes the burdens of forming a political committee and filing a campaign treasurer designation if they decide to act in concert to express their political views. These burdens fall upon the Osterbergs' expression, and are triggered by the Osterbergs' decision to exercise their First Amendment associational interest. Chapter 253 also opens to state scrutiny communications and decisions made in a marriage relationship. Indeed, whether husband and wife acted in concert was a contested fact issue and a jury question in this case. As applied, Chapter 253's in-concert provision gives importance to such inquiries as whether husband and wife conferred about an expenditure,

whether they agreed, and whether the expenditure derived from community or separate funds. The in-concert provision thus places a burden squarely on a nexus between the Osterbergs' intrinsic and instrumental associational rights. This burden can be justified only if it is narrowly drawn to advance an overriding interest. *See Buckley,* 424 U.S. at 25, 96 S.Ct. 612.

■ Generally, disclosure requirements for independent expenditures in candidate elections may advance two significant state interests. First, they may provide " 'the electorate with information as to where political campaign money comes from,' " thus alerting the voter " 'to the interests to which a candidate is most likely to be responsive and thus facilitat[ing] predictions of future performance in office.' " *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 354, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (quoting *Buckley,* 424 U.S. at 66–67, 96 S.Ct. 612). Second, "[d]isclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office." *Id.* at 356, 115 S.Ct. 1511. Thus, disclosure is intended to deter actual corruption and help avoid the appearance of corruption.

Conceivably, both interests could be advanced by Chapter 253's general requirement that a group acting in concert to make expenditures register as a political committee instead of merely allowing its members to report expenditures individually. A candidate's support may seem broad if spenders report only individually, while requiring those individuals to report their concerted action as a group may expose an influence that in reality is more concentrated.

While these interests may justify Chapter 253's in-concert distinction in other cases,[21] they cannot justify requiring the Osterbergs, as husband and wife, to form a political committee and designate a treasurer in order to spend in concert on polit-

---

21. We need not and do not decide that issue today.

ical speech. Because the value of any additional information gained in this case would be negligible, it fails to justify the concomitant burden on the Osterbergs' First Amendment rights and the accompanying intrusion into their relationship. Although marriage is "an association that promotes a way of life, not causes; a harmony in living, not political faiths,"[22] it would not be surprising to learn that spouses have in some manner acted in concert when they made direct campaign expenditures. Their registration and reporting as a committee with a treasurer would not supply new information to help the public evaluate the nature of a candidate's support. Nor would requiring spouses to register and report as political committees shine new light on the possibility of *quid pro quo* arrangements. Neither corruption nor the appearance of corruption would be deterred any more than by simply allowing spouses to report as individuals. In this case, Chapter 253's in-concert requirement does not further the state interests that justify disclosure requirements. We therefore hold that the additional requirements Chapter 253 places upon individuals who act in concert cannot constitutionally be applied to Robert and Olga Osterberg.[23] On remand, Olga cannot be held liable for "acting in concert" with Robert. Rather, she can only be held liable if the court of appeals finds sufficient evidence that she knowingly made direct campaign expenditures without reporting them.

## VII

## DOES THE PRIVATE CIVIL REMEDY VIOLATE THE OSTERBERGS' FREE SPEECH AND ASSOCIATION RIGHTS?

 The Osterbergs also challenge the constitutionality of Election Code section 253.131, which allows an opposing candidate to enforce Chapter 253's prohibitions through a private civil action. The Osterbergs argue that section 253.131 is unconstitutional because it furthers only an opposing candidate's "self-serving interests," instead of being narrowly tailored to serve a compelling state interest. They assert that the interest of an "opposing candidate" is not the same as the state's because the opposing candidate has an interest only in revenge or financial gain. Peca responds that the purpose of the private civil action is not to allow revenge or provide compensation but to encourage enforcement, and that the statute provides a disincentive for frivolous or malicious private suits by awarding attorney's fees to a prevailing defendant.

Section 253.131 provides:

(a) A person who knowingly makes or accepts a campaign contribution or makes a campaign expenditure in violation of this chapter is liable for damages as provided by this section.

(b) If the contribution or expenditure is in support of a candidate, each opposing candidate whose name appears on the ballot is entitled to recover damages under this section.

(c) If the contribution or expenditure is in opposition to a candidate, the candidate is entitled to recover damages under this section.

(d) In this section, "damages" means:

(1) twice the value of the unlawful contribution or expenditure; and

(2) reasonable attorney's fees incurred in the suit.

(e) Reasonable attorney's fees incurred in the suit may be awarded to the

---

**22.** *Griswold,* 381 U.S. at 486, 85 S.Ct. 1678.

**23.** We note that our holding that section 253.062's in-concert provision is unconstitutional is limited to the context of the husband and wife relationship. We express no opinion as to whether that provision is or is not constitutional to the extent it applies to persons other than a husband and wife acting in concert. In addition, because we hold that Section 253.062's in-concert limitation violates the Osterbergs' First Amendment rights, we need not address their argument that the provision is unconstitutionally vague.

defendant if judgment is rendered in the defendant's favor.

TEX. ELEC.CODE § 253.131.

■ We disagree with the Osterbergs' contention that section 253.131 does not advance a sufficient state interest. When an individual breaks Texas's campaign finance laws, this section allows a candidate to enforce those laws by seeking civil damages as a penalty. We agree with the Fifth Court of Appeals, which recognized that section 253.131 is designed to "deter violators and encourage enforcement by candidates and others directly participating in the process, rather than placing the entire enforcement burden on the government." *Ragsdale v. Progressive Voters League*, 790 S.W.2d 77, 84–85 (Tex.App.—Dallas) (construing an earlier version of section 253.131), *aff'd in part and rev'd in part on other grounds*, 801 S.W.2d 880, 881 (Tex.1990). Because state resources for policing election laws are necessarily limited, in many cases section 253.131 is likely to provide the only viable means of enforcing reporting requirements. Preventing evasion of these important campaign finance provisions is a legitimate and substantial state interest. *Cf. Buckley v. Valeo*, 424 U.S. 1, 66–68, 76, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (preventing evasion of valid contribution limits is a substantial governmental interest).

Furthermore, that the person enforcing the law and receiving damages can be a private party rather than the State does not mean that section 253.131 adds additional restrictions on First Amendment rights. In *Missouri Pacific Railway v. Humes*, 115 U.S. 512, 522–23, 6 S.Ct. 110, 29 L.Ed. 463 (1885), the United States Supreme Court stated that

> it is not a valid objection that the sufferer instead of the State receives [damages].... The power of the State to impose fines and penalties for a violation

of its statutory requirements is coeval with government; and *the mode in which they shall be enforced, whether at the suit of a private party, or at the suit of the public,* and what disposition shall be made of the amounts collected, *are merely matters of legislative discretion.*

(emphasis added). More recently, Justice O'Connor explained, *"Humes* teaches us that the identity of the recipient of a monetary penalty is irrelevant for purposes of determining the constitutional validity of the penalty." *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 299, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part). Regardless of Peca's motivations in bringing a private cause of action, and as with all of the statute's other enforcement mechanisms, ultimately it is the court, not an opposing party, who decides whether the Osterbergs acted unlawfully and thus could be subject to liability. *Cf. Tompkins v. Cyr*, 995 F.Supp. 664, 676–77 (N.D.Tex.1998) (deciding whether the jury's verdict—rather than the plaintiff's motive—was content neutral).

The Osterbergs do not bring a First Amendment challenge to the *severity* of the damages section 253.131 provides; they only challenge the Legislature's decision regarding *who* can seek and receive damages.[24] The Osterbergs have not demonstrated how allowing a private party to help enforce the statute adds new and significant free-speech constraints independent of those already imposed by the statute's reporting requirements, which we have held are constitutional. Moreover, they submitted no evidence that the private enforcement provision had any chilling effect on the exercise of their First Amendment rights. The Osterbergs' challenge to section 253.131 thus misses the mark. *Cf. Alexander v. Thornburgh*, 713 F.Supp. 1278, 1290 (D.Minn.) (because the

---

**24.** Because we need not address the issue in this case, we leave open the issue of whether punishment for reporting violations can rise to the level of being so severe and so extreme that it amounts to an unconstitutional infringement of rights under the First Amendment.

constitutionality of the underlying obscenity statute had been established, "the defendant's assertion that prosecution under RICO unconstitutionally chilled protected speech was unfounded" (discussing *United States v. Pryba,* 674 F.Supp. 1504, 1512 (E.D.Va.1987)), *appeal dism'd,* 881 F.2d 1081 (8th Cir.1989).

## VIII

### DEFINITION OF "CAMPAIGN EXPENDITURE"

The Osterbergs argue that the jury charge should have made clear that only money spent for advertisements that "expressly advocate" the election or defeat of a candidate constitutes a "campaign expenditure." They also argue that their advertisement was not express advocacy and thus their unreported payments were not "campaign expenditures." The court of appeals held that the Osterbergs waived these arguments by failing to object properly to the jury charge. 952 S.W.2d at 130. We need not consider whether the jury charge was correct or whether the Osterbergs properly objected to the charge because we conclude as a matter of law that the Osterbergs' advertisement was express advocacy.

### A

### IS EXPRESS ADVOCACY REQUIRED?

■ The Osterbergs argue that under *Buckley,* the Election Code cannot require expenditures to be reported unless they are for "communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley v. Valeo,* 424 U.S. 1, 80, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In *Buckley,* the United States Supreme Court narrowed the definition of "expenditures" that the federal election laws required to be reported. The federal statute defined "expenditure" as the use of money or other valuable assets "for the purpose of ... influencing" the nomination or election of candidates for federal office.

*Id.* at 77, 96 S.Ct. 612. The Court worried that the phrase had the potential to encompass the general discussion of issues in addition to advocacy of a particular political result. *Id.* at 79, 96 S.Ct. 612. If a communication only discusses issues, and is funded by individuals or groups that are "not candidates or political committees," the Court was concerned that the "relation of the information sought to the purposes of the Act may be too remote." *Id.* at 80, 96 S.Ct. 612. To insure that the federal reporting requirements' scope was not unconstitutionally broad or vague, the Supreme Court construed an expenditure by an individual "for the purpose of influencing" a candidate nomination or election to include "only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* (footnote omitted). Responding to similar concerns, *Buckley* also construed another provision that used the words "relative to" a candidate to mean "in express terms advocate the election or defeat of" a candidate. *Id.* at 44, 96 S.Ct. 612.

Since *Buckley,* a number of state courts have narrowly construed their statutory definitions of campaign expenditures or contributions to avoid the vagueness or overbreadth problems that *Buckley* identified. *See, e.g., State v. Proto,* 203 Conn. 682, 526 A.2d 1297, 1310–11 (1987); *Doe v. Mortham,* 708 So.2d 929, 933 (Fla.1998); *State ex rel. Crumpton v. Keisling,* 160 Or.App. 406, 982 P.2d 3, 9, 11 (1999); *Virginia Soc'y for Human Life, Inc. v. Caldwell,* 256 Va. 151, 500 S.E.2d 814, 817–18 (1998); *see also Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 510 (7th Cir.1998) (certifying the question of whether Indiana's definition of "political action committee" is limited to groups that make contributions or expenditures for communications that "in express terms advocate the election or defeat of a clearly identified candidate for office or the victory or defeat of a public question").

Applied to an individual making expenditures, the Texas Election Code is vulnerable to the same constitutional attacks that *Buckley*'s narrowing construction avoided. As described above, the Osterbergs were required to report "direct campaign expenditures." The Election Code states that "direct campaign expenditures" are "campaign expenditures" that are not "campaign contributions." TEX. ELEC.CODE § 251.001(8). The Election Code defines a "campaign expenditure" as "an expenditure made by any person in connection with a campaign for elective office or on a measure." TEX. ELEC.CODE § 251.001(7). Like the federal provision's language that *Buckley*construed, the phrase, "in connection with a campaign for elective office," is vague.[25] It necessarily has different meanings that depend on whether the spender is a candidate, a political committee, or an individual. More problematical, it could be read to include general issue advocacy or the general discussion of candidates. With regard to an individual, the relation of this information to the purposes of the Act "may be too remote." *Buckley*, 424 U.S. at 80, 96 S.Ct. 612.

■ However, we should, if possible, interpret statutes in a manner to avoid constitutional infirmities. *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 380 (Tex.1998). And the phrase "in connection with a campaign for elective office" does not compel an impermissibly broad construction. In *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), the Supreme Court narrowly construed similar language in a provision of the Federal Election Campaign Act. The provision prohibited corporations from using their treasury funds to make expenditures "in connection with any election." *Id.* at 248, 107 S.Ct. 616. The Court held that this provision incorporated *Buckley*'s requirement

that a communication "expressly advocate" the election of candidates. *Id.* at 248–49, 96 S.Ct. 612; *see also Federal Election Comm'n v. National Org. for Women*, 713 F.Supp. 428, 433 (D.D.C.1989) ("From *Buckley* through *MCFL*, it is clear that the standard 'in connection with an election' is not distinct from 'express advocacy.' ").

■ Relying on *Massachusetts Citizens for Life*, the Texas Ethics Commission has interpreted the Election Code's definition of "campaign expenditure" to be limited to expenditures for a communication that " 'expressly advocates' the defeat or election of an identified candidate, as that term has been used by the United States Supreme Court." Op. Tex. Ethics Comm'n No. 198 (1994). The Ethics Commission enforces the Election Code's expenditure reporting requirements. *See* TEX. ELEC.CODE §§ 253.134, 254.042. A reasonable construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex.1994); *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex.1994).

Consistent with United States Supreme Court precedent, the Ethics Commission's reasonable interpretation, and the rule that statutes are to be construed to avoid constitutional infirmities, we hold that a "direct campaign expenditure" by an individual in a candidate election includes only those expenditures that "expressly advocate" the election or defeat of an identified candidate. We therefore consider whether the Osterbergs' advertisement "expressly advocated" Biel's election or Peca's defeat.

## B

### DID THE ADVERTISEMENT EXPRESSLY ADVOCATE A CANDIDATE'S ELECTION OR DEFEAT?

■ Peca has no quarrel with applying the "express advocacy" standard. He in-

---

**25.** Because the expenditures at issue could relate only to an elective office and not a petition or ballot measure, we do not consider

the scope of the definition's application to expenditures on a "measure" as defined by section 251.001(19).

stead argues that the advertisement meets that standard because it directly advocated that viewers "VOTE FOR HIS OPPONENT." On the other hand, the Osterbergs contend that the advertisement was not express advocacy because it had contradictory pleas for action. If the viewer agreed with one proposition, the ad urged the viewer to vote for Peca; if the viewer agreed with a different proposition, the ad urged the viewer to vote against Peca. Despite this contradictory plea, we hold that the advertisement taken as a whole constitutes express advocacy as a matter of law.

In defining what constitutes express advocacy, *Buckley* recognized that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." *Buckley,* 424 U.S. at 42, 96 S.Ct. 612. *Buckley* therefore restricted "express advocacy" to "spending that is unambiguously related to the campaign of a particular federal candidate." *Id.* at 80, 96 S.Ct. 612. It thus was limited to "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n. 52, 96 S.Ct. 612. In *Massachusetts Citizens for Life,* the Court clarified that a message can be "marginally less direct" than the examples listed in *Buckley* so long as its essential nature "goes beyond issue discussion to express electoral advocacy." *Massachusetts Citizens for Life,* 479 U.S. at 249, 107 S.Ct. 616.

Unfortunately, these descriptions in *Buckley* and *Massachusetts Citizens for Life* "do not give unambiguous answers to the myriad situations that arise." *Wisconsin Right to Life, Inc. v. Paradise,* 138 F.3d 1183, 1186 (7th Cir.), *cert. denied,* 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140 (1998). Different federal courts of appeals and the Federal Election Commission have disagreed over whether communications that constitute "express advocacy" must contain certain "magic words" of advocacy akin to those listed in *Buckley,* or whether the communications should be judged as a whole and in context. *See* Thomas & Bowman, *Is Soft Money Here to Stay Under the "Magic Words" Doctrine?,* 10 STAN. L. & POL'Y REV. 33, 35 (1998); Hayward, Note, *Stalking the Elusive Express Advocacy Standard,* 10 J.L. & POL. 51, 54–55, 62–69 (1993). This disagreement, however, has no bearing on our decision, because the Osterbergs' advertisement described Peca in its first screen, and then in its second screen exhorted, using words well within those *Buckley* listed, "VOTE FOR HIS OPPONENT."

The Osterbergs contend that the advertisement's first screen makes it ambiguous. That screen recites that "Judge Peca was chosen by his peers El Paso's outstanding jurist," that he "graduated Summa Cum Laude," and that he "worked to reduce his docket over seven years," before saying "IF THAT'S ENOUGH, VOTE FOR HIM." The Osterbergs argue that this is a contradictory plea for action that gives the advertisement "several plausible meanings." They rely on *Federal Election Commission v. National Organization for Women,* in which the court held, "Because the letters are suggestive of several plausible meanings, because there are numerous pleas for action, and because the types of action are varied and not entirely clear, NOW's letters fail the express advocacy test." 713 F.Supp. 428, 435 (D.D.C.1989). That case does not apply to the Osterbergs, because the court in *National Organization for Women* concluded that "NOW's letters do not contain pointed exhortations to vote for or against particular persons. The three mailings include no explicit words directing the reader how to vote." *Id.* at 434. As opposed to NOW's mailings, the Osterbergs' advertisement "cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians." *Massachusetts Citizens for Life,* 479 U.S. at 249, 107 S.Ct. 616.

The Osterbergs also argue that their advertisement does not meet the standard that the Ninth Circuit announced for "express advocacy" in *Federal Election Commission v. Furgatch,* 807 F.2d 857 (9th Cir.), *cert. denied,* 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987). In *Furgatch,* the court stated that to be "express advocacy," a communication must,

> when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.... [S]peech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning.... [S]peech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action.
>
> We emphasize that if any reasonable alternative reading of speech can be suggested, it cannot be express advocacy subject to the Act's disclosure requirements.

*Id.* at 864.

Admittedly, the Osterbergs' first screen does attribute some favorable qualifications to Peca. And then, in all capitals, it says, "IF THAT'S ENOUGH, VOTE FOR HIM." But the advertisement's second screen renders it "unmistakable and unambiguous, suggestive of only one plausible meaning." In all capitals, it directly advocates the viewer to "BRING THE COURTHOUSE BACK TO THE PEOPLE," and "VOTE FOR HIS OPPONENT," if the viewer wants someone who understands that "the Courthouse exists for the people, and not for judges, acci-

dents of politics, and lawyers"; "[t]he spirit of the law, not just the letter, must be employed for justice and the people"; or "[e]fficiency at the expense of justice cannot be tolerated." This admonishment reveals the "essential nature" of the advertisement. It "goes beyond issue discussion to express electoral advocacy." *Massachusetts Citizens for Life,* 479 U.S. at 249, 107 S.Ct. 616.

The first screen's statement, "IF THAT'S ENOUGH, VOTE FOR HIM," does not negate this "essential nature." The first screen essentially tells voters that Peca's standards are—according to Osterberg—too low, and the second screen urges viewers to vote for what Osterberg considers to be higher standards by voting against Peca. As the court of appeals observed, "The message is clear: credentials are not 'enough,' and Peca does not understand that the courthouse exists for the people." 952 S.W.2d at 131. While the advertisement's strategy and efficacy are debatable, the fact that it constitutes express advocacy is not. Whether the advertisement is effective advocacy is of little consequence to the determination of whether it is express advocacy.

The Osterbergs' advertisement is no less express and no less advocacy than the contradictory messages in *Massachusetts Citizens for Life,* which the Supreme Court held amounted to express advocacy. In that case, the advertisement included a disclaimer that read: "This special election edition does not represent an endorsement of any particular candidate." *Massachusetts Citizens for Life,* 479 U.S. at 243, 107 S.Ct. 616. The Court held that "the disclaimer of endorsement cannot negate" the fact that the communication's essential nature was express advocacy. *Id.* at 249, 107 S.Ct. 616. Like the communication in *Massachusetts Citizens for Life,* the first screen in the Osterbergs' advertisement does not diminish its essential express advocacy nature. We therefore hold as a matter of law that the Osterbergs' advertisement was express advocacy and thus

their expenditures were campaign expenditures.

## IX

## SUBSTANTIAL COMPLIANCE

In answering questions four and eight, the jury found that Robert and Olga "failed to file a report of expenditures by an individual no later than the 8th day before election day for the direct campaign expenditures found ... to have been made." On appeal, the Osterbergs argued for the first time that they need only "substantially comply" with the Election Code's expenditure reporting provisions, and that they did so. They contended that because there was insufficient evidence to support the unrequested "substantial compliance" issue, the evidence was legally and factually insufficient to support the jury's finding that they failed to report their expenditures.

The court of appeals held that the Osterbergs waived their substantial compliance argument. The court explained:

> The Osterbergs never argued prior to, or during, trial that substantial compliance satisfies the filing requirements of Section 254.124. The jury was instructed that the statute requires filings on the 30th and 8th day *prior to* the election without mention of substantial compliance. The question submitted to the jury inquired whether Robert Osterberg "failed to file a report of expenditures by an individual *not later than the 8th day before election day* ...." [Emphasis added]. The Osterbergs did not object to the instruction or to the question on "substantial compliance" grounds. They neither requested an instruction to the jury on substantial compliance, nor submitted a jury question seeking a finding that their May 4 filing substantially complied with the statutory requirement.

952 S.W.2d at 129.

The court of appeals thus evaluated the sufficiency of the evidence under the defi-

nition in the trial court's charge as submitted to the jury, rather than by some hypothetical charge that the Osterbergs failed to seek through objection or request. *Id.* (citing *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *Allen v. American Nat'l Ins. Co.,* 380 S.W.2d 604, 609 (Tex.1964)). Reviewing the evidence to support the issue *as submitted,* the court of appeals concluded:

> The evidence is undisputed that Robert Osterberg failed to file a report "not later than the 8th day before election day" as the jury charge inquired. Accordingly, we find the evidence sufficient, both legally and factually, to support the jury's finding.

952 S.W.2d at 129.

In arguments that shroud vacuity in vagueness, the Osterbergs contend in this Court that "[t]he court of appeals was wrong" because:

> 1) the sufficiency points were preserved through the post-judgment motions; 2) an objection to the charge was not necessary to preserve an objection as to sufficiency error; and 3) where the party with the burden of proof fails to present the proper standard of proof, the law, not the court's charge, measures the sufficiency of the evidence.
>
> The sufficiency of the evidence as to compliance was properly preserved. Once preserved, it was the duty of the reviewing court to apply the proper law to that sufficiency analysis. The court of appeals erred in refusing to do so.

The Osterbergs cite no legal authority that actually supports their claim that the court of appeals was wrong.

Contrary to the Osterbergs' arguments, the court of appeals did not rule that the sufficiency points were not preserved. As is clear from the court of appeals' opinion, the court considered the sufficiency points and concluded that the evidence was both

factually and legally sufficient to support the jury's answers to question four.[26]

To the extent the Osterbergs are contending in this Court that the evidence is not legally sufficient to support the jury's answers to questions four and eight, we agree with the court of appeals that the evidence is legally sufficient to support the jury's findings because "[t]he evidence is undisputed that Robert [and Olga] Osterberg failed to file a report 'not later than the 8th day before election day' as the jury charge inquired."

The Osterbergs' third argument could be understood to make one of two different assertions. One provides no reason to overturn the court of appeals' holding; the other is wrong. To the extent the Osterbergs are asserting, again, that appellate courts have the ability to review jury verdicts to ensure that legally sufficient evidence supports those verdicts, we agree. As noted, the court of appeals undertook such a review and concluded that legally sufficient evidence supported the verdict. We agree with that conclusion.

■ The Osterbergs could instead be arguing that when a court submits a defective issue to the jury, an appellate court should review the sufficiency of the evidence against the question and instruction that the trial court should have submitted—not the one actually submitted—even if the defect was never brought to the court's attention and the question or instruction never requested. That assertion is misguided. Even if Peca had a burden of proof with regard to some substantial compliance standard—an issue we do not decide today—it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge. TEX.R. CIV. P. 272, 274, 278, 279; *see also Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *Allen v. American Nat'l Ins. Co.,* 380 S.W.2d 604,

609 (Tex.1964). As we recently stated in *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91 (Tex.1999), if the trial court has "to resolve a legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial." *Id.* at 94. For these reasons, we need not consider the Osterbergs' arguments, to the extent they are made, that we should apply a substantial compliance standard when that standard was not submitted to the jury.

## X

## ATTORNEY'S FEES

■ Finally, Peca complains that the court of appeals erred in holding that he waived recovery of attorney's fees. Section 253.131 entitles an opposing candidate who proves a violation of Chapter 253 to recover, in addition to damages based on the value of the unlawful contribution or expenditure, "reasonable attorney's fees incurred in the suit." TEX. ELEC.CODE § 253.131(d)(2). The trial court submitted a question asking the jury to "[f]ind, in dollars and cents, the total amount that would be a reasonable attorney's fee for the services by 'Plaintiff's attorney' incurred in this case." The jury informed the trial court that it was deadlocked on that question. After that disclosure, Peca failed to object or request an answer to his attorney's fees question. Instead, Peca asked the trial court to accept the incomplete verdict, and then asked the court to enter judgment as a matter of law for his attorney's fees. The trial court refused, and the court of appeals affirmed, holding that Peca had waived the issue for appeal. 952 S.W.2d at 132. Peca argues that his failure to request a jury answer did not waive his right to attorney's fees because

---

**26.** The court of appeals did not review the evidence that Olga failed to file a report, because it had already concluded that there

was no evidence that she knowingly violated the statute.

his uncontroverted evidence entitled him to attorney's fees as a matter of law.

In finding that Peca waived his right to attorney's fees, the court of appeals relied on this Court's decision in *Fleet v. Fleet*, 711 S.W.2d 1 (Tex.1986). In *Fleet*, we held that a trial court will not be reversed for rendering judgment on an incomplete verdict unless the party who would benefit from answers to the unanswered issues objects to the incomplete verdict before the jury is discharged. *Id.* at 3. *Fleet* followed *Continental Casualty Co. v. Street*, 379 S.W.2d 648 (Tex.1964), in which the plaintiff did not object to the jury's failure to answer questions regarding the amount he was entitled to under an insurance policy. Because the plaintiff in *Continental Casualty* failed to object before the jury was discharged, this Court held that "[t]he trial court had no alternative under the jury verdict but to render judgment for [Continental Casualty], and [the plaintiff] waived any benefit he might have claimed under the unanswered issues, and any right to have them answered." *Id.* at 651; *see also Lewis v. Texas Employers' Ins. Ass'n*, 151 Tex. 95, 246 S.W.2d 599, 601 (1952) (to preserve error for appeal, a party must object to unanswered questions in a verdict before the jury is discharged); Elliott, *Jury Trial: Verdict, in* 4 McDONALD TEXAS CIVIL PRACTICE § 25:7, at 415–16 (Allen et al. eds., 1992 ed.) ("[E]very material question must be answered by the jury and the court cannot, in any circumstances, supply findings on unanswered or incompletely answered material questions. . . . A party who . . . silently allows the verdict to be accepted and the jury to be discharged waives the right to complain that the questions are unanswered, and the trial court may disregard the unanswered questions and render judgment for the party entitled to prevail under the findings made."); Jones, *Waiver of Unanswered and Conflicting Special Issues*, 38 TEX. L.REV. 93, 100 (1959) ("[T]he effect of the failure to detect the unanswered issues and call the trial court's attention to this defect is a complete waiv-

er of *all* benefits based on such issues. That is, the unanswered issue can afford no basis for a judgment or ground for appeal unless timely objection is made."). Peca, by failing to object when the jury did not return an answer, waived any benefit from the jury question, waived any right to have the trial judge supply his own fact-finding or grant a new trial on the issue, and waived his right to appeal a judgment on the issue of attorney's fees. We affirm the court of appeals' judgment regarding attorney's fees.

## XI

In accordance with our discussion above, we affirm the court of appeals' judgment against Robert Osterberg, and we affirm the court of appeals' judgment that Peca take nothing in his attorney's fees claim. We reverse the court of appeals' judgment that Peca take nothing from Olga Osterberg, and remand to the court of appeals for proceedings consistent with this opinion.

Justice GONZALES concurring with opinion to follow.

Justice ENOCH filed a dissenting opinion, in which Chief Justice PHILLIPS, Justice HANKINSON, and Justice O'NEILL joined.

Justice GONZALES, concurring.

I withdraw my July 29, 1999 concurring opinion and substitute the following.

I agree with the Court that the Texas Election Code's direct-campaign-expenditure disclosure requirements, with the exception of the in-concert provision, survive the Osterbergs' specific constitutional challenges. This Court appropriately rejects the Osterbergs' argument that the Election Code's approach to regulation—which begins with a rule generally forbidding direct campaign expenditures but makes that rule subject to specified exceptions—is facially unconstitutional.

The Court also correctly concludes that section 253.131(a) of the Election Code allows persons to be held civilly liable for violating the reporting requirements without proof that they knew they were breaking the law. On its face, section 253.131(a) is ambiguous.[1] It could be read to require proof that the person making the campaign contributions or expenditures knew that failing to report them violated the Election Code before civil liability could attach. However, as the Court properly advises, our primary aim is to give effect to the Legislature's intent.[2] And as the Court points out, the Legislature demonstrated in two other sections of the Election Code that it clearly knew how to require that the actor have knowledge of the Election Code before being charged with a violation. The Court's construction is further supported by the fact that sections 253.003(b), 253.005(a), and 253.131(a) were all amended in the 1987 revision of the Election Code.[3]

I write separately, however, for three reasons. First, I would elaborate on the reasons why section 253.131(a) does not offend First Amendment guarantees of free speech, even though it allows a civil suit for damages for failure to report a campaign expenditure without requiring the plaintiff to prove the defendant knew about the specific reporting requirement. Second, I disagree with the plurality's and dissent's respective evaluations of the sig-

nificance of the United States Supreme Court's decision in *United States v. X–Citement Video, Inc.*[4] Third, while I conclude section 253.131(a) is constitutional, I note my concern that Chapter 253 raises other constitutional concerns not challenged in this case.

### A.

The Court correctly concludes that Chapter 253 imposes constitutionally permissible reporting requirements, not a ban or ceiling on expenditures. But enforcing the reporting requirements also must not offend the First Amendment. When the Court states that Peca need not prove the Osterbergs' subjective knowledge of electoral laws, it necessarily implies that the Constitution does not require that a person know he is violating the election laws before being punished. The Court's opinion states that section 253.131(a) does not violate the Osterbergs' First Amendment rights because the statute does not prevent them from making campaign expenditures.[5] Then the opinion concludes that the statute merely requires the Osterbergs to report their expenditures, and that reporting requirements comport with the constitutional guidelines established in *Buckley v. Valeo*[6] and *McIntyre v. Ohio Elections Commission.*[7]

But the issue here is not merely whether Chapter 253 prevents the Osterbergs from

---

1. *See* TEX. ELEC.CODE § 253.131(a) ("A person who knowingly makes or accepts a campaign expenditure or makes a campaign expenditure in violation of this chapter is liable for damages as provided by this section.").

2. *See Heckler v. Mathews,* 465 U.S. 728, 741–42, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) ("'The canon favoring constructions of statutes to avoid constitutional questions does not ... license a court to usurp the policy-making and legislative functions of duly-elected representatives. Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute ... or judicially re-

writing it.") (citations and internal quotation marks omitted).

3. *See* Act of May 30, 1987, 70th Leg., R.S., ch. 899, § 1, 1987 Tex. Gen. Laws 2995, 3005 & 3011 (current version at TEX. ELEC.CODE §§ 253.003(b), 253.005(a), 253.131(a)).

4. 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).

5. (12 S.W.3d 45).

6. 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

7. 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

making a campaign expenditure. More than that, the issue is whether the Court's construction of section 253.131(a), which allows a penalty for a violation of Chapter 253 whether or not an individual knows of the duty to report, is constitutional. While section 253.131(a) does not directly constrain speech, under the Court's construction, it can impact speech. Imposing liability on an unknowing violator has the indirect effect of penalizing core First Amendment speech.

In *Buckley v. Valeo*, the Supreme Court evaluated the constitutionality of campaign expenditure limits and reporting requirements.[8] The Supreme Court, however, did not consider the constitutionality of the enforcement of the reporting requirements. Thus, *Buckley* does not fully answer whether the Constitution allows this particular burden on speech.

In *McIntyre v. Ohio Elections Commission*, the Supreme Court considered an Ohio statute that prohibited the distribution of anonymous campaign literature.[9] A person was fined under that statute for distributing anonymous leaflets that opposed a local tax proposal.[10] The Supreme Court concluded that the statute was unconstitutional, however, it noted that these disclosure requirements rested on different and less powerful state interests than the state interests in campaign expenditure reporting.[11] Thus, *McIntyre*, like *Buckley*, does not fully dispose of the question before us.

The dissent's analysis is likewise incomplete. The dissent contends that the Court's application of the statute, punishing the Osterbergs solely for engaging in core First Amendment activity, without more, is unconstitutional. But direct limitations on speech can be constitutional if the limitation is content neutral and survives the appropriate standard of scrutiny.[12] As the Supreme Court has stated, "It has been clear since this Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest."[13] Even when the primary effect of a content-neutral law is to restrict core First Amendment speech, the Supreme Court has held the constitutionality of the restriction "turns on whether the governmental interests advanced in [the restriction's] support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression."[14] Thus, the "something more" that the dissent apparently seeks and the Constitution requires is a substantial state interest in the limitation on speech. But rather than comparing the state interest here with the impact on speech, the dissent simply concludes without further analysis that this application must be unconstitutional.

Although the current Federal Election Campaign Act and several state reporting statutes impose liability for failing to report campaign expenditures, whether such liability can be enforced in the absence of the actor's knowledge appears to be an issue of first impression. The federal reporting statute imposes liability for both knowing and unknowing failures to report campaign expenditures.[15] Thirteen states

8. 424 U.S. at 12–13, 60, 96 S.Ct. 612.

9. 514 U.S. at 336, 115 S.Ct. 1511.

10. *See id.* at 337–38, 115 S.Ct. 1511.

11. *See id.* at 356, 115 S.Ct. 1511.

12. *See Buckley*, 424 U.S. at 44–45, 96 S.Ct. 612.

13. *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *accord Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

14. *Buckley*, 424 U.S. at 44–45, 96 S.Ct. 612.

15. 2 U.S.C. § 434g(a)(5)(A), (B). However, the version of the federal statute construed in *Buckley* did not have any express knowing requirement. *See Buckley* 424 U.S. at 76–77, n. 99, 96 S.Ct. 612.

in addition to Texas require individuals making campaign expenditures to file reports with the state. Seven states impose liability for non-reporting under statutes that contain no express scienter requirement.[16] The other six states have an express knowing term in their reporting statute.[17] Of those six, the Missouri and Delaware statutes most closely resemble section 253.131(a). The Delaware statute states, "Any person who knowingly accepts or knowingly makes an unlawful contribution or expenditure in violation of any provision of subchapter II or III of this title shall be guilty of a class A misdemeanor."[18] But we are unaware of any decision construing this provision.

The Missouri statute provides that "[a]ny person who knowingly accepts or makes a contribution or makes an expenditure in violation of any provision of this chapter ... may be held liable to the state in civil penalties in twice the amount of any such contribution or expenditure, not to exceed a total amount of five thousand dollars."[19] The statute also provides that "any person who purposely violates the provisions of this chapter is guilty of a class A misdemeanor."[20] One court recently construed this provision to require the state to prove that the defendant purposely violated the statute, not merely that he engaged in purposeful acts that violated the statute.[21] The remaining four states that have a knowing requirement in their reporting statute require proof of a knowing violation of the reporting requirement, not merely proof of a knowing act that violates the statute.[22]

Although I am unaware of any decision upholding a statute imposing liability for an unknowing violation of a reporting requirement, we are not entirely without guidance. The Supreme Court has articulated that a statute is constitutional unless every application of the statute violates the First Amendment or unless the statute is substantially overbroad so as to create a realistic danger that the statute itself will significantly compromise recognized First Amendment protections.[23]

I would evaluate whether section 253.131(a) has a constitutional application, by turning to the principles articulated in

**16.** Alaska, ALASKA STAT. § 15.13.125 (1998); Florida, FLA. STAT. ANN. § 106.085 (1992); Massachusetts, MASS. GEN. L. ch. 55, § 18 (1991); Nebraska, NEB. REV. STAT. § 49–1467 (1998); North Carolina, N.C. GEN. STAT. § 163–278.27 (1999); Ohio, OHIO REV.CODE ANN. § 3517.99(M) (1995); Virginia, VA.CODE ANN. § 24.2–929 (1997).

**17.** Connecticut, CONN. GEN.STAT. ANN. § 9–333y (1989); Delaware, DEL.CODE. ANN. § 8043 (1999); Iowa, IOWA CODE ANN. § 56.16 (1999); Mississippi, MISS.CODE. ANN. § 23–15–811 (1999); Missouri, MO. ANN. STAT. § 130.072 (1997); Louisiana, LA.REV.STAT. ANN. § 1505.4 (1980).

**18.** DEL.CODE. ANN. § 8043.

**19.** Mo. ANN. STAT. § 130.072.

**20.** *Id.*

**21.** *See State v. Owen,* 990 S.W.2d 158, 160 (Mo.Ct.App.1999).

**22.** *See* CONN. GEN.STAT. ANN. § 9–333y ("Any person who knowingly and willfully violates any provision of this chapter shall be fined...."); IOWA CODE ANN. § 56.16 ("Any person who willfully violates any provisions of this chapter shall upon conviction, be guilty of a serious misdemeanor."); LA.REV.STAT. ANN. § 1505.4 ("[Any person] who knowingly fails to file or who knowingly fails to timely file any such reports as are required by this Chapter may be assessed a civil penalty...."); MISS.CODE ANN. § 23–15–811 ("Any candidate or other person who shall willfully and deliberately and substantially violate the provisions and prohibitions of this article shall be guilty of a misdemeanor....").

**23.** *See Members of City Council of Los Angles v. Taxpayers for Vincent,* 466 U.S. 789, 797–98, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (upholding a municipal rule that forbade the posting of signs on public property, where the effect was to prevent a political candidate from posting campaign signs on utility poles); *see also New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (rejecting a First Amendment freedom of association challenge of a city ordinance forbidding discrimination in certain private clubs).

*Buckley.* In that case, the Supreme Court explained that campaign expenditures operate in an area of the most fundamental First Amendment activities.[24] Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution.[25] Thus, a limitation on this core First Amendment speech will be constitutional only if the limitation passes exacting scrutiny as articulated in *Buckley.* In other words, the limitation must bear a sufficient relationship to a substantial state interest.[26]

*Buckley* recognized three substantial governmental interests in requiring disclosure of campaign expenditures.[27] The state's interest in enforcing its disclosure requirements are the same here. First, independent expenditure disclosure furthers the state's effort to achieve total disclosure by reaching every kind of political activity in order to ensure voters are fully informed. This informational interest helps voters to ascertain more of the candidates' constituencies. Second, disclosure plays a part in the state's attempt to deter corruption and undue influence through publicity. Third, the provision responds to the legitimate fear that efforts would be made, as they have in the past, to avoid the disclosure requirements by financially supporting candidates through avenues not explicitly covered by the other provisions of the statute. Thus, independent expenditure disclosure compliments the general disclosure requirements by shedding the light of publicity on unambiguously campaign-related spending that would not otherwise be reported.

I would determine whether section 253.131(a) bears a sufficient relationship to these substantial government interests by considering section 253.131(a)'s impact on speech. In doing so, I recognize the difficulty in ascertaining how section 253.131(a) impacts speech differently from the impact the reporting requirements themselves have on speech. As the Supreme Court noted in *Buckley,* reporting requirements are constitutional even when they deter some who might otherwise contribute.[28] Potential liability for an unknowing violation has additional impacts on speech. First, a person found liable may be less willing to re-enter the political discussion since they were penalized for their prior actions. Second, a person may be less willing to undertake large expenditures in light of the double penalty that section 253.131 imposes. These are troubling concerns because as the Supreme Court noted in *Buckley,* effective participation in the public arena may require large expenditures.[29] Third, potential liability for an unknowing violation may deter activism in different political contexts for fear of some other unknown liability.

While these impacts on speech are not insignificant, the competing state interests are substantial. It might be argued that imposing a requirement that an individual knowingly violates the law is a less restrictive means of mitigating the evils of campaign corruption and voters' lack of information. But the cost to the statute's effectiveness is reasonably clear. As the Court argues, proving a contributor knew about the reporting requirements yet chose to violate them would be inordinately difficult in most cases. Also, a person determined to violate the reporting laws need only avoid learning what the regula-

---

**24.** *See Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

**25.** *See id.; see also Nixon v. Shrink,* —— U.S. ——, 120 S.Ct. 897, 903, —— L.Ed.2d —— (2000).

**26.** *See Buckley,* 424 U.S. at 80, 96 S.Ct. 612.

**27.** *See id.* at 66–67, 76, 81, 96 S.Ct. 612.

**28.** *See id.* at 68, 96 S.Ct. 612. ("It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute.").

**29.** *See id.* at 19–20, 96 S.Ct. 612.

tions required. On the other hand, enforcing the reporting requirements regardless of knowledge provides incentive to learn what the regulations require and to abide by them. Consequently, I believe that section 253.131(a) bears a sufficient relationship to the state's substantial interest to meet the exacting scrutiny required under *Buckley.* Because the Court's application is constitutional, it cannot be said that every application of section 253.131(a) violates the First Amendment. Thus, I conclude section 253.131(a) satisfies the first part of the test articulated by the Supreme Court in *City Council of Los Angeles.*[30]

I would then turn to the second part of the test: whether section 253.131(a) is substantially overbroad so as to create a realistic danger that the statute itself will significantly compromise recognized First Amendment protections. Liability can arise under section 253.131(a) for either a knowing or unknowing violation. Both the Court and the dissent seem to agree that liability under section 253.131(a) would be constitutional when a person knowingly violates the statute. I believe they are right because the state interests are not substantially outweighed by the chilling effects the statute would have on free speech. Second, as I concluded above, section 253.131(a) is constitutional when liability is enforced on an unknowing violator. Thus, section 253.131(a) is not unconstitutionally overbroad and satisfies the second part of the test announced in *City Council of Los Angeles.*[31] Therefore, I conclude that section 253.131(a) passes constitutional scrutiny.

### B.

I do not join part V of the plurality's opinion because I believe it misconstrues *United States v. X–Citement Video, Inc.*[32] in responding to the dissent. The plurality concludes that *X–Citement* "stands for the proposition that a person must be aware of engaging in certain conduct—not aware of violating a particular statute—before being punished for conduct that otherwise is protected by the First Amendment."[33] I believe the case has more to do with notice of the essential elements of a crime.

The opinion in *X–Citement* primarily concerns statutory construction. In *X–Citement* the Supreme Court reviewed a conviction under the Protection of Children Against Sexual Exploitation Act of 1977,[34] which criminalized acts of (1) knowingly transporting or shipping visual depictions of minors engaged in sexually explicit conduct and (2) knowingly receiving, distributing or reproducing such depictions.[35] The defendant there was convicted for selling video tapes involving an actress who was a minor when she made the films.[36] The United States Court of Appeals for the Ninth Circuit reversed, holding the statute unconstitutional for not containing a scienter requirement that the defendant knew one of the performers was a minor.[37] The Supreme Court reversed, holding that a scienter requirement could be implied in the federal statute.[38] The Supreme Court acknowledged that under the statute's most natural grammatical reading, "knowingly" did not modify the

**30.** *Members of City Council of Los Angles v. Taxpayers for Vincent,* 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *see also New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988).

**31.** *Members of City Council of Los Angles,* 466 U.S. at 801, 104 S.Ct. 2118.

**32.** 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).

**33.** 12 S.W.3d 45.

**34.** 18 U.S.C. § 2252 (1988 ed. and Supp. V).

**35.** *X–Citement,* 513 U.S. at 66–68, 115 S.Ct. 464.

**36.** *See id.* at 66, 115 S.Ct. 464.

**37.** *See id.* at 67, 115 S.Ct. 464.

**38.** *See id.* at 78–79, 115 S.Ct. 464.

element regarding the age of the performers.[39] But the Supreme Court found an implied scienter requirement for several reasons.[40] First, if the statute did not require a knowing violation it would lead to absurd results, for example, criminalizing the conduct of a retail druggist who unknowingly returns an uninspected roll of developed film containing pictures of minors engaged in sexually explicit conduct.[41] Second, the Supreme Court acknowledged the strong presumption that criminal statutes require scienter for each of the statutory elements that criminalize otherwise innocent conduct.[42] Third, the Supreme Court looked at the federal statute's legislative history and concluded that because the committee reports and floor debates indicated that Congress intended that the term "knowingly" modify another part of the subsection containing the term "minor", it was difficult to conclude that "knowingly" did not also modify the remainder of the subsection.[43] Finally, the Supreme Court concluded that a statute completely bereft of a scienter requirement regarding the age of the actors would raise serious constitutional doubts; therefore, as a rule of construction, the Supreme Court read the statute so as to eliminate those doubts.[44]

While *X–Citement* may be instructive for purposes of statutory construction, it does not guide the constitutional evaluation of section 253.131(a). The Supreme Court in *X–Citement* construed an additional mens rea element in the criminal statute to avoid serious constitutional problems. Nevertheless, the plurality's and the dissent's respective opinions erroneously presume that the constitutional problems to be avoided primarily related to the First Amendment. But the Supreme Court's main concern in *X–Cite-*

*ment* was whether the statute satisfied the notice and fairness concerns underpinning the long-standing criminal law principle that mens rea requirements must be applied to every fact element of a crime.[45] The First Amendment conduct was relevant in the *X–Citement* analysis because without a knowing requirement in the criminal statute an individual could be engaged in what he perceived as protected First Amendment speech without sufficient notice that his conduct was no longer permitted. This is a significant concern because the public is entitled to notice whenever generally believed legal conduct has been made illegal. The Supreme Court's construction of a knowing requirement satisfied these notice and fairness concerns.

While *X–Citement* may articulate important statutory construction principles, they do not have force here. First, the Court's interpretation of section 253.131(a) does not produce the odd or absurd results that concerned the Supreme Court in *X–Citement*. Here, section 253.131(a) punishes only those individuals who fail to report knowing campaign expenditures. Second, there is nothing in the legislative history to show that the Legislature intended to punish only knowing violations of section 253.131(a). Finally, as I conclude above, the Constitution does not require a knowing violation of the reporting statute. Thus, there is no need to construe the statute to include a knowing requirement in order to make it constitutional.

### C.

While I conclude that section 253.131(a) is a constitutional enforcement provision, I note other concerns arising from Chapter 253 that were not raised by the Oster-

---

39. *See id.* at 68, 115 S.Ct. 464.

40. *See id.* at 68–78, 115 S.Ct. 464.

41. *See id.* at 69, 115 S.Ct. 464.

42. *See id.* at 70–73, 115 S.Ct. 464.

43. *See id.* at 73–78, 115 S.Ct. 464.

44. *See id.* at 78, 115 S.Ct. 464.

45. *X–Citement*, 513 U.S. at 70, 115 S.Ct. 464; *see also Staples v. United States*, 511 U.S. 600, 611, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

bergs. In particular, I am concerned that the Election Code's disclosure requirements may be so cumbersome for ordinary citizens that they unduly burden free speech. The sheer complexity of the requirements, coupled with the severe consequences of non-compliance, may chill the activism of ordinary individuals who lack the sophistication or experience needed to understand and comply with the Election Code.

The first difficulty one encounters with the Election Code is coping with its definitions, which spell out the scope of its regulatory provisions.[46] A "direct campaign expenditure" is defined as "a campaign expenditure that does not constitute a campaign contribution by the person making the expenditure."[47] A "campaign expenditure," in turn, is "an expenditure made by any person in connection with a campaign for an elective office or on a measure."[48] A "campaign contribution," by contrast, is "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure."[49]

These definitions are not very lucid. For one thing, it may not be apparent, from the perspective of an ordinary citizen, that "in connection with a campaign" refers solely to communications expressly advocating the election, passage, or defeat of a clearly identified candidate or measure. It is also not clear whether a coordinated expenditure—one made in cooperation or consultation with a candidate—is a campaign contribution or a direct campaign expenditure. How a coordinated expenditure is characterized is important, for

it determines who—the candidate or the person making the expenditure—has the burden of reporting it. So an ordinary citizen must consult the Texas Ethics Commission Rules (or a lawyer) to clarify this ambiguity: "A campaign expenditure is not a contribution from the person making the expenditure if ... it is made without the prior consent or approval of the candidate or officeholder on whose behalf the expenditure was made."[50]

At least one thing is clear. An "expenditure" is defined very broadly to include "a payment of money or any other thing of value."[51] An expenditure as minor as the cost of drafting or copying an issue-oriented handbill or mailing a letter may trigger the Election Code's requirements.[52]

Texas's regulatory scheme for direct campaign expenditures begins with Chapter 253 of the Texas Election Code. Section 253.002 prohibits a person from knowingly making or authorizing a direct campaign expenditure unless the expenditure is authorized by Subchapter C.[53] This general prohibition does not apply to corporations, labor organizations, candidates, political committees, or campaign treasurers acting in an official capacity, whose expenditures are regulated under other Election Code provisions.[54]

Subchapter C, comprised of Sections 253.061 through 253.063, describes the circumstances under which an ordinary citizen can make a direct campaign expenditure. Section 253.061 provides that an individual may make direct campaign expenditures of up to $100 if he or she is "not acting in concert with another person" and receives no reimbursement for

---

46. *See* Tex. Elec.Code § 251.001.

47. *Id.* § 251.001(8).

48. *Id.* § 251.001(7).

49. *Id.* § 251.001(3).

50. 1 Tex. Admin. Code 20.1. (1999)(Tex. Ethics Comm'n, Definitions).

51. Tex. Elec.Code § 251.001(6).

52. *See* Op. Tex. Ethics Comm'n No. 177 (1993) (stating that expenditures include "the cost of producing ... brochures plus any distribution costs, such as postage").

53. *See* Tex. Elec.Code § 253.002.

54. *See id.* § 253.002(b) (listing exceptions).

the expenditures.[55] Section 253.062 allows an individual "not acting in concert with another person" to make direct campaign expenditures exceeding $100 if "the individual complies with Chapter 254 as if the individual were a campaign treasurer of a political committee."[56]

Chapter 254 spells out the detailed record-keeping, report-filing, and written-notice requirements with which a campaign treasurer must comply. First, "[e]ach campaign treasurer of a political committee shall maintain a record of all reportable activity" containing "the information that is necessary for filing the reports required by this chapter" and "preserve the record for at least two years."[57] Second, a campaign treasurer must, under pain of committing a Class A misdemeanor, "deliver written notice of [any political expenditure] to the affected candidate or officeholder not later than the end of the period covered by the report in which the reportable activity occurs."[58] Third, the Election Code details the contents required in the reports, the entities to which they must be sent, and the various reporting periods that apply.[59]

As the Court illustrates, the reporting requirements are not trivial.[60] Fortunately, the Commission has made compliance easier by making forms and campaign finance guides available over the Internet.[61] But the fact that those forms and guides are tailored for political committees, not individuals, makes an ordinary citizen's task of completing the forms that much more complicated.

Even after an ordinary citizen divines what information must be reported and how to report it, determining the proper filing authority with whom to file the reports is no easy task. Because the Election Code itself does not make this clear,[62] one must turn to the Ethics Commission Rules for guidance. These Rules instruct an individual making a direct campaign expenditure under Section 253.062 to file reports as if the individual were a campaign treasurer of a specific-purpose political committee.[63] There are different filing authorities depending on the office sought by the candidate supported or opposed by a specific-purpose political committee. Committees supporting or opposing candidates for a seat in the state legislature or on the state board of education or for other statewide and multi-county district offices must file reports with the Texas Ethics Commission.[64] Committees seeking

---

**55.** *Id.* § 253.061.

**56.** *Id.* § 253.062(a)(1).

**57.** *Id.* § 254.001(b),(c),(d).

**58.** *Id.* § 254.128; *accord* Op. Tex. Ethics Comm'n No. 331 (1996) ("An individual 'not acting in concert with another person' who makes a direct campaign expenditure supporting a candidate is also required to give notice to the candidate."); *see also* Tex. Penal Code § 12.21 (providing punishment of up to $4,000 and one-year's confinement in jail for committing a Class A misdemeanor).

**59.** *See* Tex. Elec.Code §§ 254.121–254.184.

**60.** *See* 12 S.W.3d 42 (discussing many of the details that must be provided in the reports).

**61.** *See* Texas Ethics Commission, *Forms & Instructions* (last revised Feb. 2, 2000)

<http:// www.ethics.state.tx.us/ filinginfo/forms & in.htm>.

**62.** Section 253.062 requires an individual to file as if he or she were the campaign treasurer of a political committee. *See* Tex. Elec. Code § 253.062. The Election Code, however, provides different filing requirements depending on whether the committee is special- or general-purpose. *Compare id.* § 254.130 *with id.* § 254.163 (specifying different filing authorities for the different committee types); *see also id.* §§ 251.001(13) & (14) (defining special- and general-purpose committees). And the Election Code simply does not indicate which of these two committees—general-purpose or specific-purpose—an individual under Section 253.062 is supposed to model.

**63.** *See* 1 Tex Admin. Code § 22.5(b)(2)(1999) (Tex Ethics Comm'n, Direct Campaign Expenditures).

**64.** *See id.* § 20.3. (Reports filed with the Commission).

to influence elections for county, district, or precinct offices must file their campaign treasurer appointments with the county clerk, elections administrator, or tax assessor-collector, as designated by the particular county.[65] The filing authority for committees seeking to influence elections for other offices varies.[66] If, because the committee is supporting or opposing more than one candidate, reports must be filed with multiple authorities, then the committee may choose to file the reports with the commission only.[67]

And the complexity does not end there. An individual cannot expect to file just one report and be done with it. The Election Code sets forth several reporting periods in which reports are required, even if no expenditures are made.[68] Reports must be filed semi-annually,[69] thirty days before the election,[70] and eight days before the election.[71] Also, expenditures above a specified threshold made in the nine days preceding the election must be reported in telegram reports.[72] Only by filing a dissolution report with a sworn statement that no further reportable expenditures are expected is the individual relieved of filing additional reports.[73]

In summary, the Election Code's reporting requirements are cumbersome and complicated. As a result, the Election Code may deter ordinary citizens from disseminating their own views. This raises the question, yet unanswered by the United States Supreme Court, of whether a set of disclosure requirements can be so onerous that they violate the First Amendment.[74]

It is the Legislature's prerogative to structure this State's campaign finance laws. But that prerogative is subject to constitutional limitations. This State's campaign finance laws must not unduly burden political speech of ordinary citizens. There could be future cases in which other provisions of Chapter 253 are constitutionally challenged and speech is so significantly constrained as to render those provisions of the Election Code unconstitutional. That has not, however, been done in this case. Accordingly, I concur.

Justice ENOCH, joined by Chief Justice PHILLIPS, Justice HANKINSON, and Justice O'NEILL, dissenting.

Because the Osterbergs made arguments in their motion for rehearing that merit discussion, I withdraw my July 29, 1999 dissenting opinion and substitute the following.

This is a statutory construction case. Ironically, the Court's chosen construction of section 253.131(a) of the Election Code gives less protection to Texas citizens engaged in the core First Amendment activity of speaking about an election than the United States Supreme Court's chosen construction of the federal child obscenity act has given to peddlers of child pornography. Because there is no evidence the

**65.** *See id.* § 20.5 (Reports filed with a county filing authority).

**66.** *See id.* §§ 20.3—20.7.

**67.** *See id.* § 20.9 (Filing opinion for certain specific-purpose committees).

**68.** *See* TEX. ELEC.CODE § 254.031(b) ("If no reportable activity occurs during a reporting period, the person required to file a report shall indicate that fact in the report.").

**69.** *See id.* § 254.123.

**70.** *See id.* § 254.124(b).

**71.** *See id.* § 254.124(c).

**72.** *See id.* § 254.038.

**73.** *See id.* § 254.126.

**74.** *Cf. Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 437 (Tex.1998) (suggesting that permissible free speech restrictions should be " 'set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with' ") (quoting *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 579, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)).

Osterbergs knew they were violating the Election Code when they failed to timely comply with its reporting requirements, I respectfully dissent.

Section 253.002 of the Election Code makes direct campaign expenditures unlawful unless the person making the expenditure complies with Subchapter C to Chapter 253.[1] Subchapter C contains two sections concerning expenditures—253.061 and 253.062. Of these, because Mr. Osterberg spent more than $100 on the television ad, only section 253.062 is relevant. It provides:

> (a) Except as otherwise provided by law, an individual not acting in concert with another person may make one or more direct campaign expenditures in an election from the individual's own property that exceed $100 on any one or more candidates or measures if:
>
>> (1) the individual complies with Chapter 254 as if the individual were a campaign treasurer of a political committee.... [2]

Under Chapter 254, a political committee's campaign treasurer is required to file two reports, one no later than thirty days before election day,[3] and the other no later than the eighth day before election day.[4] The contents of these reports are specified in sections 254.031 and 254.121 of the Election Code.[5]

To facilitate enforcement of section 253.002, section 253.131 of the Election Code creates a private cause of action against a "person who *knowingly* makes or accepts a campaign contribution or makes a campaign expenditure in violation of [Chapter 253 of the Election Code]." [6] To decide this case, we must determine whether the word "knowingly" in section 253.131(a) modifies the entire succeeding clause including the phrase "in violation of [the Election Code]," or whether it only modifies the phrase "makes a campaign expenditure." I agree with the court of appeals' conclusion that for Mr. and Mrs. Osterberg to be liable to Judge Peca for violating the Election Code, Judge Peca had to present some evidence that the Osterbergs were aware their actions violated the Code.[7]

I believe we are obliged to give section 253.131(a) this construction. We have stated that "it is our duty as a court to construe statutes in a manner which avoids serious doubt of their constitutionality." [8] We followed unequivocal United States Supreme Court precedent in making this statement.[9] Not surprisingly, other state courts uniformly adhere to this rule of statutory construction.[10] And here, the

---

1. *See* Tex. Elec.Code § 253.002(b)(1).

2. *Id.* § 253.062.

3. *Id.* § 254.154(b).

4. *Id.* § 254.154(c).

5. *Id.* §§ 254.031, -.121; *see also* 1 Tex. Admin. Code § 22.5.

6. Tex. Elec.Code § 253.131(a) (emphasis added).

7. 952 S.W.2d at 126–27.

8. *Federal Sav. & Loan Ins. Corp. v. Glen Ridge I Condominiums, Ltd.,* 750 S.W.2d 757, 759 (Tex.1988); *see also State v. Edmond,* 933 S.W.2d 120, 124 (Tex.Crim.App.1996); *Miami Indep. Sch. Dist. v. Moses,* 989 S.W.2d 871, 876 (Tex.App.—Austin 1999, pet. denied); *cf.*

*Camp v. Gulf Prod. Co.,* 122 Tex. 383, 61 S.W.2d 773, 777 (Tex.1933).

9. *See Glen Ridge I,* 750 S.W.2d at 759 (citing *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 841, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)); *see also Concrete Pipe & Prod. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 628–29, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

10. *See, e.g., Slayton v. Shumway,* 166 Ariz. 87, 800 P.2d 590, 595 (Ariz.1990); *People v. Superior Court,* 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628, 633 (Cal.1996); *State v. Globe Communications Corp.,* 648 So.2d 110, 113 (Fla.1994); *State v. Petersilie,* 334 N.C. 169,

constitutional implications of imposing liability on persons for engaging in protected speech under the First Amendment mandate the conclusion that in section 253.131(a), "knowingly" modifies the entire clause, including "in violation of [the Code]." [11]

The television ads that Robert Osterberg designed and had produced and aired were political speech. As such they are protected by the First Amendment.[12] Because independent campaign expenditures implicate First Amendment concerns, a law that requires reporting or disclosing campaign expenditures passes constitutional muster only if it "bears a sufficient relationship to a substantial governmental interest." [13]

Moreover, such a law cannot bring within its sweep any "innocent" violations. In construing a statute somewhat similar in structure to section 253.131(a), the United States Supreme Court held that the word "knowingly" in the federal child obscenity act had to apply to the age of the performer and the sexually explicit nature of the material, and not merely to the element of transporting such materials.[14] The Supreme Court indicated that this construction of the act was not its "most natural grammatical reading," [15] but because it is presumed that Congress did not intend an unconstitutional act, that construction must be the one it intended.[16] Otherwise, the act would punish persons who knew only that they were engaged in protected First Amendment activity. An act having such an effect is not constitutionally permissible.[17]

The analysis is even more compelling here for at least two reasons. First, Robert Osterberg, in making the expenditure for which Judge Peca sought to hold him liable, was exercising his fundamental First Amendment freedom of speaking out about the election of public officials.[18] A statute that punished him solely for engaging in this core First Amendment activity, without more, would be unconstitutional.[19] Yet that is precisely what the Court's construction does. The Court says "knowingly" modifies only the act of spending money. But spending money on core First Amendment speech cannot, in and of itself, be against the law—there has to be something more. And a statute that punished a person who knew only that he had engaged in innocent First Amendment activity would be unconstitutional—the Constitution requires that he know something more.[20] In *X–Citement*, that something more happened to be the age of the performer and the sexually explicit nature of the materials. Here, that something more happens to be the fact that the expenditure had to be reported.

Second, it is grammatically sound to give the statute at issue in this case the reading

---

11. Tex. Elec.Code § 253.131(a).

12. *See F.E.C. v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 251, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("Independent expenditures constitute expression ... at the core of our electoral process and of the First Amendment freedoms.").

13. *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

14. *See United States v. X–Citement Video, Inc.*, 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).

15. *X–Citement Video*, 513 U.S. at 68.

16. *Id.* at 68–69.

17. *Id.* at 72–73; *see also Manual Enters., Inc. v. Day*, 370 U.S. 478, 492–93, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962); *Smith v. California*, 361 U.S. 147, 150–53, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Wieman v. Updegraff*, 344 U.S. 183, 191, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

18. *See F.E.C.*, 479 U.S. at 251.

19. *See, e.g., X–Citement*, 513 U.S. at 72–73.

20. *See id.*

432 S.E.2d 832, 838 (N.C.1993); *Baptist Med. Ctr. of Okla., Inc. v. Aguirre,* 930 P.2d 213, 219 (Okla.1996); *see also* 16A Am.Jur.2d § 176, at 56–57 (1998).

compelled by the Constitution, whereas it was not for the statute at issue in *X–Citement.* The Supreme Court's observation that its construction of that statute was not "[t]he most natural grammatical reading"[21] was, as the dissenting opinion pointed out, an "understatement to the point of distortion—rather like saying that the ordinarily preferred total for two plus two is four."[22] That statute reads:

(a) Any person who—

(1) *knowingly* transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—

(A) the producing of such visual depiction involves the use of a *minor engaging in sexually explicit conduct;* and

(B) such visual depiction is of such conduct;

(2) *knowingly* receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or *knowingly* reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—

(A) the producing of such visual depiction involves the use of a *minor engaging in sexually explicit conduct;* and

(B) such visual depiction is of such conduct. . . .[23]

As the emphasized language indicates, in sections (a)(1) and (a)(2) the word "knowingly" is very remote from the phrase "minor engaging in sexually explicit conduct"—the words do not even appear in the same subsection, and they are separated by clauses involving the elements of transport or distribution and of visual de-

piction. And again, as the dissent noted, "[t]he word 'knowingly' is contained, not merely in a distant phrase, but in an entirely separate clause from the one into which [the Court's] opinion inserts it."[24] Nonetheless, the Court, to preserve the statute's constitutionality, chose the *un*grammatical construction that "knowingly" must modify the element "minor engaging in sexual conduct."

Here, the phrase we must construe creates a private cause of action against a "person who *knowingly* makes or accepts a campaign contribution or makes a campaign expenditure *in violation of* [Chapter 253 of the Election Code]."[25] The word "knowingly" modifies the phrase containing "in violation of [the Election Code]," and these words are nowhere near as remote from one another as the relevant words are in the *X–Citement* statute. And while it may be "natural" to give the statute the reading the Court does today, it is no less "natural," and indeed it is grammatically sound, to take the Constitution into account and construe "knowingly" to modify the entire succeeding phrase, including "in violation of [the Election Code]."

*X–Citement's* method of statutory construction is particularly instructive. There, the federal child obscenity act either criminalized transporting material when the person doing so knew the material involved minors and was sexually explicit, in which case it would have been constitutional. And that's exactly what the *X–Citement* majority concluded. Or, the act criminalized transporting such material merely when the person transporting it knew it was being transported, in which case it would have been unconstitutional. And that's what the *X–Citement* dissent concluded.

---

21. *Id.* at 68.

22. *Id.* at 81 (Scalia, J., dissenting).

23. 18 U.S.C. § 2252 (quoted in *X–Citement,* 513 U.S. at 68) (emphasis added).

24. *X–Citement,* 513 U.S. at 81 (Scalia, J., dissenting).

25. TEX. ELEC.CODE § 253.131(a) (emphasis added).

Likewise here, the Election Code says one of two things. Either it says that a person can be punished simply because that person knowingly made an expenditure, in which case it would be unconstitutional. Or, it says that a person can be punished if that person makes an expenditure with knowledge that the expenditure violates the Election Code, in which case (assuming the statute is free of other constitutional defects) it would be constitutional.

But despite these compelling reasons for my construction, the plurality and the concurrence[26] misconstrue *X–Citement* and instead adopt Judge Peca's argument that "knowingly" in section 253.131(a) modifies only the act of contributing or spending, not violating the Code; that is, all a person needs to "know" before that person can be held liable is the fact of a contribution or expenditure, not that the contribution or expenditure violated the Election Code. As its reason for doing so, the Court[27] accepts Judge Peca's claim that any other construction of section 253.131(a) would make "ignorance of the law" a defense.[28] In short, the Court chooses Judge Peca's construction, supporting an abstract concept, rather than a construction supporting the First Amendment. Thus, the Court concludes that "in section 253.131[ (a) ], 'knowingly' applies only to whether one is making a 'campaign contribution' or 'campaign expenditure'" as defined by the statute.[29]

The Court justifies divorcing "knowingly" from the Election Code violation by claiming that two other provisions in the Election Code demonstrate the Legislature knew how to require that a defendant have actual knowledge his conduct was illegal when it wanted such a requirement. I reiterate the Court's argument:

The Legislature made clear in other sections of the Election Code when it specifically wanted to require a person to know the law is being violated. *See, e.g.,* TEX. ELEC.CODE § 253.003(b) ("A person may not *knowingly* accept a political contribution *the person knows to have been made in violation of this chapter.*") (emphasis added); § 253.005(a) ("A person may not knowingly make or authorize a political expenditure wholly or partly from a political contribution *the person knows to have been made in violation of this chapter.*") (emphasis added). The Legislature clearly knew how to require that the actor have knowledge of the Election Code before being charged with a violation. Because the Legislature did not include a similar knowledge requirement in section 253.131[ (a) ], we should not presume to add that requirement ourselves.[30]

I disagree. Not only does the Court's construction render the Act unconstitutional, it also produces the ironic result that only *candidates* like Judge Peca are protected from civil liability when unaware that they are violating the Election Code, while *ordinary citizens* like Mr. and Mrs. Osterberg can be liable for twice the amount they expend for even the most innocuous of unknowing violations. Neither the Election Code's structure nor section 253.131(a)'s language compels this unconstitutional construction. Rather, the Code provisions on which the Court relies equally suggest legislative intent that all persons, candidates and citizens alike, are protected from civil liability for unlawful expenditures or contributions, whether made or received, unless they knew the expenditures or contributions violated the Code. Section 253.003(b) imposes liability

26. Justice Gonzales does not join part V of Justice Abbott's opinion, in which Justice Abbott responds to my reading of *X–Citement*.

27. Justice Gonzales does, however, join part II of Justice Abbott's opinion; in part II, the Court construes the "knowingly" requirement in section 253.131(a).

28. *See* 12 S.W.3d at 38 (citing TEX. PENAL CODE § 8.03(a)).

29. *Id.* at 38.

30. *Id.* at 38.

for accepting a contribution only when the person knows the contribution violated the Code. Section 253.005(a) imposes liability for making an expenditure from a contribution only when the person knows the contribution violated the Code. Likewise, section 253.131(a) shields a person from liability for making an expenditure or a contribution that violates the Code unless the person knows the expenditure or contribution violates the Code. All three provisions share a common underpinning—there is no liability unless the person knows the contribution or expenditure violated the Code.[31]

But the Court criticizes my construction of the Election Code by arguing that it "would hamper section 253.131(a)'s purpose by undermining its enforceability. Enforcement would be problematic because future cases would focus on whether the defendant knew the specific code provisions, and whether the defendant operated under a correct legal interpretation."[32] The Court contends that it would undercut legislative intent to construe the statute to allow "[a] defendant [to] avoid civil enforcement simply by refusing to learn the election laws."[33]

This is absurd. First, parties can prove "knowing" violations of the Election Code the same way they prove other claims with a "knowing" element—primarily through circumstantial proof from which an inference of knowledge can be made. Over 40 years ago. the United States Supreme Court considered an argument similar to the Court's and rejected it:

> It is argued that unless the scienter requirement is dispensed with, regulation of the distribution of obscene material will be ineffective, as booksellers will falsely disclaim knowledge of their books' contents or falsely deny reason to suspect their obscenity. We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind. Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.[34]

Second, even if a knowledge requirement is problematic, it's the standard the Legislature chose. As the Court acknowledges, "it is within the Legislature's province, not ours, to establish the degree of knowledge necessary to violate a statute."[35] Finally, the Court's construction suffers from the same so-called problems it identifies with my construction. In fact, it compounds them by adding the further irony that *citizens like Mr. Osterberg* can be held liable under the Election Code without knowing they violated it, while *candidates like Judge Peca* can violate the Code with impunity so long as they follow the Court's blueprint of "refusing to learn the election laws." The more sensible approach, and the one that avoids constitutional doubts,

---

31. Other provisions of the Election Code employ the same structure as section 253.131(a) to focus on whether the person knew a contribution or expenditure violated the Code. *See* Tex. Elec.Code § 253.0341(d) ("A person who knowingly makes or accepts a contribution [to a legislative caucus] in violation of this section is liable for damages to the state in the amount of triple the value of the unlawful contribution."); *Id.* § 253.132(a) ("A corporation or labor organization that knowingly makes a campaign contribution to a political committee or a direct campaign expenditure in violation of Subchapter D is liable for damages as provided by this section to each political committee of opposing interest...."); *Id.*

§ 253.133 ("A person who knowingly makes or accepts a political contribution or makes a political expenditure in violation of this chapter is liable for damages to the state in the amount of triple the value of the unlawful contribution or expenditure.").

32. 12 S.W.3d at 38 (citations omitted).

33. *Id.* at 38.

34. *Smith v. California,* 361 U.S. 147, 154, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (citations omitted).

35. 12 S.W.3d at 38 n. 4.

is to construe the Election Code consistently as requiring knowing violations before civil liability attaches.

I agree with the court of appeals' conclusion that there is no evidence Olga Osterberg knowingly violated the Election Code.[36] The only evidence Judge Peca cites to support the existence of a knowing violation by Robert Osterberg is that Albert Biel heard Judge Peca's remarks at the February 8, 1994 bar luncheon about Mr. Osterberg's lack of compliance with the Election Code, and that at some point Mr. Biel told Mr. Osterberg about these comments. This is no evidence that Mr. Osterberg knew he was violating the Election Code when he failed to make a report no later than eight days before the election. Mr. Osterberg does not dispute that he violated the Election Code by not making this report in a timely fashion. But Judge Peca presented no evidence showing *when* Mr. Osterberg found out about Judge Peca's comments. The timing of the violation is important to the knowledge requirement. The violation occurred on that date when the report was to be filed. There is no evidence in this record that Mr. Osterberg was aware *on or before that date* that the Election Code required the report to be filed. Had Judge Peca presented some evidence supporting a reasonable inference that Mr. Biel reported Judge Peca's comments to Mr. Osterberg *before* the report was due, my conclusion would be different. But Judge Peca offered no such evidence. Accordingly, there is no evidence Mr. Osterberg knowingly violated the Election Code.

The Court misconstrues section 253.131(a). Under the proper, constitutional reading of section 253.131(a), Judge Peca had the burden to prove Mr. Osterberg knowingly violated the Election Code. Judge Peca failed to meet that burden. Accordingly, I dissent.