**AFFIRM; and Opinion Filed May 12, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00373-CV

**BV ENERGY PARTNERS, LP AND BV REAL ESTATE MANAGEMENT, INC.,
Appellants
V.
RICHARD M. CHEATHAM, TSAR ENERGY, LLC, TSAR-BLUE, LLC,
AND TSAR-WV, LLC, Appellees**

**On Appeal from the 192nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. 11-13622**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Lang-Miers

BV Energy Partners, LP and BV Real Estate Management, Inc. (collectively BV) appeal

from a take-nothing judgment rendered against them after a jury trial. The dispute between BV

and appellees Richard M. Cheatham and the Tsar entities (collectively Cheatham) concerns BV's

claim that it is entitled to a share of over $41 million in profits generated from investments in the

Marcellus Shale, one of the nation's largest natural gas reservoirs located on about 65 million

acres in eight states in the eastern United States. BV sued Cheatham for breach of fiduciary duty

and money had and received. The jury found against BV. In three issues, BV argues that the

evidence is legally and factually insufficient to support the jury's adverse finding on its money-

had-and-received claim, and the jury charge contained reversible error. For the reasons that

follow, we affirm the trial court's judgment. Because the dispositive issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

## I. BACKGROUND

BV is a real estate developer whose principals are Chuck Anderson, Pryor Blackwell, and Tom Leiser. Cheatham's background is in the oil and gas industry. Anderson and Blackwell had known Cheatham for many years, and BV made several oil and gas investments over the years through Cheatham and another oil and gas man, Chuck Miller.

In 2004, BV Energy, Cheatham, and others formed a limited liability company named Tsar Energy II, LLC to invest in oil and gas interests in Indiana and Illinois. Cheatham was its managing member and received a management fee. Pursuant to the exclusivity provision in the regulations of Tsar II, Cheatham was required to devote 100% of his time during normal work hours to the business of Tsar II and was prohibited from entering into any new oil and gas ventures with anyone other than a Tsar II member as long as he was Tsar II's managing member and Tsar II owned investments. It is undisputed that Tsar II invested in only one deal before July 2007. In late 2007, but effective July 2007, the Tsar II regulations were amended to delete the exclusivity provision and Cheatham's management fee because Tsar II owned no assets and was being dissolved.

In the years following the formation of Tsar II, Cheatham brought oil and gas investment opportunities to BV, and BV invested in some of them, but not through Tsar II. BV also invested in oil and gas opportunities through Miller, sometimes with and sometimes without Cheatham.

In August 2007, Anderson received an email from his brother telling him about an opportunity to invest in the "Marcellus Shale development project." Prospectuses prepared by J. Howard Bass, a geologist, were attached to the email. Bass was attempting to acquire lease

options in the Marcellus Shale and was working with Charles Copeland to find investors. Anderson forwarded his brother's email to Cheatham, stating:

> Do you have an opinion on this, I need to give my brother some feedback. [T]hanks[.]

Anderson testified that this email "was an invitation to say, hey, look at this thing. Let's go do this together if it looks good." About two weeks later, Cheatham responded:

> [C]huck, on that [P]enn deal that your bro sent, ask [your brother] if they would provide maps and a land plat. [I] know some about that area."

Cheatham said he never received the information.

Meanwhile, Anderson's brother talked to Copeland and told him "we'd have interest in oil and gas, but my brother in Dallas handles that." So Anderson's brother introduced Copeland to Anderson. Anderson and Copeland talked and Anderson said, "well, we'd have interest in that, but we do our investing through a guy we know." Copeland said Anderson "introduced me to Richard Cheatham." Copeland and Cheatham met around July 2007, Copeland introduced Cheatham to Bass, and Cheatham and Bass signed an agreement regarding the Marcellus Shale.

In November 2007, Cheatham asked BV for funds. BV sent Cheatham two checks totaling close to $500,000. In December, Cheatham sent BV an email stating:

> Chuck
>
> So you will have a record of such things:
>
> There will be four project areas in the West Virginia Marcellus Shale.
>
> 1.      Parkersburg - BV paid $245,000 for 25% of the 14,000 gross and 12,275 net acre MeadWestvaco oil and gas lease acreage. Title is presently held in the name of Acadian Energy. We will sell 50% interest in this lease at $125 an acre so you, with your permission, will go down in interest to 10% and receive $230,000 thus ending up with 10% in the acreage spread for around $15,000. The geologist is putting together prospects now and we will drill our first well there in 2008.
>
> 2.      Bowden - we are purchasing an existing gas field for $2.5mm plus a carry of 5 to 10% for the deal guy. BV should take 10% for $250,000 for 10% [sic]. I have already put up $200,000 as a deposit and am putting up more deposit in the

–3–

next few days to give our engineer more time to come up with our work program for 2008. We plan on moving uphole and opening and fracing the Marcellus Shale in an existing wellbore. There is a pipeline in place so putting the well on production should be fairly easy.

3.      Big Mineral - I have an agreement in place whereby we have access to a 83,000 mineral block. You can buy in if you want but it may be "dead money" until the play moves closer to this area.

4.      Greenbrier - this is a large oil and gas lease block that we are acquiring for the Marcellus Shale. BV will want to have a smallish working interest spread out over all the acreage which will be between 300,000 acres to 400,000 acres. This is a more long term play. I have made substantial deposits and have most of the agreements in place. This is a 2008 expenditure for the acreage.

Thanks,
Richard

Anderson responded:

I should have the check for you sometime early afternoon.  If you have the room we would like to go to 15% vs. 10[%].  We are in for the "[B]ig Mineral" and the Greenbrier. . . .

Over the next few years, Cheatham acquired and sold leases in the Marcellus Shale that resulted in millions of dollars in profits.  BV's principals periodically asked Cheatham for updates on their investments.  Anderson said they did not fully understand Cheatham's explanations and they would ask Cheatham to meet with them to further explain the transactions, but they never got the clarification or information they sought.  As a result, in March 2011, BV sent a letter to Cheatham concerning

your consistent[] lack of response to emails and texts, your failure to provide documents as promised, and your unwillingness to adhere to our TSAR II Agreement[] to provide even the most basic promised documentation on our investments with you (inside and outside of TSAR),[1] to provide copies of closing statements, accounting records and written updates of any kind . . . .

---

[1]BV initially alleged that Cheatham had an obligation to bring BV the Marcellus Shale opportunity exclusively pursuant to the Tsar II regulations, but abandoned that allegation at trial.  However, BV presented evidence that it and Cheatham continued to invest in oil and gas deals, including the Marcellus Shale, based on the structure established in the Tsar II regulations.

The letter advised Cheatham that he was in violation of the exclusivity provision of the Tsar II regulations and gave him a deadline by which to respond to its request for information. Cheatham responded that the exclusivity provision in the Tsar II regulations was deleted four years earlier. Cheatham offered to refund BV's investment in the Marcellus Shale if BV was "not entirely comfortable with the proposed business relationship[.]"

In October 2011, BV sued Cheatham. The original petition sought an accounting and a declaration of the rights and obligations with respect to various investments. By the seventh amended petition, BV alleged that it had formed a partnership with Cheatham to invest in the Marcellus Shale, that Cheatham breached his fiduciary duty to BV by taking BV's money and turning it into substantial profits for himself, and that Cheatham held money that in equity and good conscience belonged to BV. BV alleged that its share of the profits from the Marcellus Shale was in excess of $21 million.

Cheatham denied that he and BV had formed a partnership to invest in the Marcellus Shale. He claimed that BV invested in only three leases: Parkersburg, Rupert, and Bowden. He calculated BV's share of the Parkersburg and Rupert leases to be around $1.6 million and offered to send checks for that amount (Bowden was not the subject of the lawsuit). BV did not accept the payments. Almost a year later, Cheatham calculated BV's share of those leases at between $1.6 million and a $2.5 million. He sent BV two checks totaling the greater amount. BV did not accept the checks because Cheatham would not agree to place the checks in the registry of the court. Cheatham expressed his willingness to reissue the checks to BV, but BV did not respond.

The parties presented their evidence to a jury, which found against BV on its claims of a partnership and for money had and received.

## II. DISCUSSION

In issue 1, BV argues that the evidence is legally and factually insufficient to support the jury's "no" answer to whether Cheatham held money that in equity and good conscience belonged to BV. In issues 2 and 3, BV contends that the jury charge contained reversible error.

We begin our analysis by examining BV's contention that the jury charge contained reversible error. Ordinarily we would consider a legal sufficiency point first because that would result in rendition rather than remand. *Latham v. Burgher*, 320 S.W.3d 602, 606 n.1 (Tex. App.—Dallas 2010, no pet.). However, before we can measure the sufficiency of the evidence, we must identify the standard against which the evidence is to be measured. *Id.* We do this by determining whether the charge contained error and whether an objection to the jury charge was preserved. *Id.* (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002), and *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000)). If the charge does not contain error, we measure the sufficiency of the evidence against the charge that was submitted. *Id.*

### A. Jury Charge

We review claims of jury charge error for an abuse of discretion. *Bryan v. Watumull*, 230 S.W.3d 503, 508 (Tex. App.—Dallas 2007, pet. denied). A court does not abuse its discretion when it submits a charge based on the pleadings and evidence. *See* TEX. R. CIV. P. 278; *Park N. Serv. Ctr., L.P. v. Applied Circuit Tech., Inc.*, 338 S.W.3d 719, 721 (Tex. App.—Dallas 2011, no pet.).

With regard to BV's claim that it formed a partnership with Cheatham to invest in the Marcellus Shale, the trial court proposed the following charge:

### QUESTION 1

Did BV Energy or BV Real Estate and either of the Defendants listed below create a partnership to invest in all deals in the Marcellus Shale Play that Cheatham had an opportunity to acquire?

BV objected to Question 1 stating, "[W]e object to the word 'all' in the question, where it says, invest in all deals, and request that in lieu of the word 'all', [sic] the Court use the word 'any'.[sic]" The court overruled the objection.

With regard to BV's claim for money had and received, the court proposed the following charge:

### QUESTION 6

Does Cheatham hold money that in equity and good conscience belongs to BV Energy or BV Real Estate from investments in all deals in the Marcellus Shale Play that Cheatham had an opportunity to acquire?

A Defendant holds money that in equity and good conscience belongs to a Plaintiff if that Defendant would be unjustly enriched were it not required to return the money to the Plaintiff.

BV objected to this question stating, "Question 6, again we object to the use of the words in all deals and request the Court use the word in any deals. Again, because we think it's consistent with the evidence." The court overruled the objection.

BV contends that it was error to submit Questions 1 and 6 using the word "all" instead of "any" when referring to the deals in the Marcellus Shale. BV contends that it did not present an "all or nothing" theory at trial and that the questions as phrased prevented the jury from finding in its favor on some, but not all, of the leases in the Marcellus Shale. BV contends that the evidence was undisputed that Cheatham owed BV $2.5 million for the Parkersburg and Rupert leases and that the questions as phrased prevented the jury from making findings in its favor on those investments.

Cheatham argues that BV did not preserve its objections to the phrasing of Questions 1 and 6 because the objections were not specific enough to alert the trial court to the complaint, and the record does not show that the trial court was aware of BV's specific complaint.

We do not need to decide whether the objections were sufficient to preserve BV's complaints about the jury charge because we conclude that the jury charge did not contain error.

### 1.    BV's Pleadings

In its seventh amended petition, BV alleged that Anderson introduced Cheatham to the Marcellus Shale opportunity, that Cheatham "determined that [it] was a terrific investment opportunity," and that Cheatham "set out to keep it for himself and Tsar."  BV alleged that it formed a partnership with Cheatham to invest in the Marcellus Shale; that "BV entrusted money to Cheatham and Tsar Energy for the purpose of investing in the Marcellus Shale opportunities Cheatham described and those introduced to him by Bass (through BV)"; that "Cheatham and Tsar Energy received $495,154.13 that, in equity and good conscience, belongs to BV, and the defendants have been unjustly enriched by the funds and the profits that were obtained in connection with them"; that "Cheatham reaped millions in profits by leveraging BV's funds"; and that "Cheatham proposes to pay BV only a tiny percentage of the profits despite the fact that BV appears to have contributed the vast majority of Cheatham's actual (but undisclosed) cost to purchase the interests that he acquired for himself and the Tsar entities."

The 35-page petition alleged that Cheatham misrepresented the transactions involving the Parkersburg and Rupert leases to BV and wrongfully excluded BV from participating in the Beury, Plum Creek, and Nuttal leases.  These were all the leases in the Marcellus Shale in which Cheatham was involved.  The petition alleged that Cheatham "took the money BV entrusted" to him, "turned it into an enormous profit," and did so "secretly and dishonestly[.]"  As relief, BV prayed for, among other things, "disgorgement of all profits earned in connection with the Marcellus Shale investments described in this Petition," and "a constructive trust on all of Defendants' interests in any property or entity related to the Marcellus Shale investments described in this Petition or traceable thereto."

## 2. The Evidence

At trial, from its opening statement through its presentation of evidence and closing arguments, BV's theory was that it had a partnership with Cheatham to invest in all of Cheatham's deals in the Marcellus Shale, and that Cheatham and the Tsar entities owed BV over $21 million as BV's share of the profits from those investments. During opening statement, BV's lawyer told the jury that it intended to prove that BV and Cheatham were partners and that BV was cheated out of $21 million in profit by Cheatham. He repeatedly referred to Cheatham as a "con man." Anderson testified that he introduced Cheatham to Copeland and Bass and that BV was "the source of the deal." BV claimed that if Anderson had not introduced Cheatham to Copeland, Cheatham "would not have it[.]" During cross-examination, Anderson stated more than once that BV had a partnership with Cheatham or his entities to invest in all deals in the Marcellus Shale:

> Q.      Well, are you telling this Jury back in 2007 you were in a partnership to invest in all deals in the Marcellus Shale?
>
> A.      Yes, that's what I'm saying.

BV presented evidence that its damages were calculated at 52.5% of the profits from the investments in the Marcellus Shale, or over $21 million on its $500,000 investment, because that represented the proportion of the investment BV contributed. Anderson agreed that this calculation "assumes not only that a BV entity had an interest in Rupert and Parkersburg, but also an interest in" the other leases in the Marcellus Shale in which Cheatham was involved.

## 3. Analysis

Having reviewed BV's pleadings and evidence, we conclude that BV did present an "all or nothing" theory with regard to its share of the profits in the Marcellus Shale. BV's pleadings and evidence did not alert the trial court that BV was seeking relief with regard to some, but not all, of the leases. BV did not present any evidence of damages to which it was entitled other than

–9–

the $21 million that it claimed it was due as its share of the profits from all investments in the Marcellus Shale. Consequently, we conclude that the trial court did not abuse its discretion by submitting Questions 1 and 6 as phrased. We resolve issues 2 and 3 against BV.

## B.       Sufficiency of the Evidence

In issue 1, BV argues that the evidence is legally and factually insufficient to support the jury's adverse finding that Cheatham did not hold money that in equity and good conscience belonged to BV.

### 1.       Standards of Review

In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Edwards v. Mid-Continent Office Distributors, L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied). We first determine whether there is legally sufficient evidence to support the finding, ignoring all evidence to the contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Edwards*, 252 S.W.3d at 836.

Additionally, if we conclude there is no evidence to support the adverse finding, to succeed on appeal BV must also demonstrate that the evidence conclusively established the facts in its favor as a matter of law. *Dow Chem.*, 46 S.W.3d at 241. And a matter is conclusively established only if reasonable people could not differ in their conclusions about the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

In evaluating BV's claim that the evidence is factually insufficient to support the jury's adverse finding, we must consider and weigh all the evidence to determine whether BV

–10–

demonstrated that the adverse finding is so against the great weight and preponderance of the evidence as to render the finding clearly wrong and unjust. *Dow Chem. Co.*, 46 S.W.3d at 242.

Under either review, we are mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and that it is improper to substitute our judgment for the jury's simply because we may disagree with its findings. *City of Keller*, 168 S.W.3d at 819. The jury may choose to believe one witness and disbelieve another. *Id.* We must assume jurors decided all credibility questions in favor of the verdict if reasonable persons could do so. *Id.*

### 2. Applicable Law

A claim for money had and received seeks equitable relief. *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 205 (Tex. 2007) (per curiam). It is not premised on wrongdoing, but "looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ). It seeks to restore money where equity and good conscience require refund. *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 813 (Tex. App.—Dallas 2012, no pet.). Recovery "does not 'depend on the parties' agreement or intent but rather the law's presumption of a promise of compensation if one receiving another's money would thereby be unjustly enriched.'" *Id.* at 814 (quoting *Amoco*, 946 S.W.2d at 164). A defendant may present any facts and raise any defenses that would deny a claimant's right under this theory. *Id.* Simply put, a claim for money had and received is dependent upon a balancing of the equities in each unique case. *See Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162 (Tex. 2007) (per curiam).

### 3. Analysis

The evidence was undisputed that BV invested approximately $500,000 in the Marcellus Shale and had not received its original investment or any return on its investment at the time of trial. But the evidence showed that Cheatham had offered BV what he calculated as its share of the profits three different times. BV rejected Cheatham's last offer because Cheatham would not agree to place the checks in the registry of the court. But Cheatham testified that BV could have accepted his payment and in turn written a check on BV's own account and placed that check in the registry of the court, but BV did not do so. Cheatham also said he was willing to reissue the checks to BV, but BV never asked him to reissue the checks.

The jury also could have found that Cheatham was not unjustly enriched because there was evidence that the $2.5 million he offered BV did not factor in additional expenses that were incurred which caused the expenses to exceed the returns. Cheatham testified that a contractor sued Bass and him over the Marcellus Shale and caused Bass to file bankruptcy. Although Cheatham was ultimately dismissed from the lawsuit, he said he incurred almost $2 million in settlement and legal fees. Cheatham also testified that he had spent more defending this lawsuit against BV than the $2.5 million he offered to BV. He said if he had to pay BV what it sought in this lawsuit, he would lose $9 million. And he testified that his expert did not factor in these expenses when he calculated BV's share of the profits to be at most $2.5 million.

The jury also could have found that Cheatham was not unjustly enriched because he spent his own money and sweat equity to make the deals successful. BV claimed Cheatham leveraged the $500,000 in cash BV contributed and used "house money" to make the deals successful. As a result, BV contended, it was due its share of the over $40 million in profits Cheatham received. Cheatham testified that he spent over $1 million of his own money. But the evidence also showed that Cheatham contributed a substantial amount of sweat equity finding leases in the

–12–

Marcellus Shale and making them successful. His value to the deals was compared to that of a quarterback in a football game. Cheatham's expert testified that Cheatham was entitled to a 25% payment for sweat equity. But BV claimed that Cheatham agreed to perform the sweat equity without compensation and was not entitled to any additional compensation for his sweat equity.

In summary, the jury heard conflicting testimony and was entitled to believe BV's version, Cheatham's version, or some combination of the two. It resolved the evidence in Cheatham's favor. Having reviewed the entire record, we conclude that there is more than a scintilla of evidence upon which the jury could have balanced the equities in Cheatham's favor and found adversely to BV on its claim for money had and received. And after reviewing the conflicting evidence under the appropriate standard, we cannot conclude that the jury's adverse finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. We resolve issue 1 against BV.

### III. CONCLUSION

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

140373F.P05

–13–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BV ENERGY PARTNERS, LP AND BV
REAL ESTATE MANAGEMENT, INC.,
Appellants

No. 05-14-00373-CV      V.

RICHARD M. CHEATHAM, TSAR
ENERGY, LLC, TSAR-BLUE, LLC AND
TSAR-WV, LLC, Appellees

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 11-13622.
Opinion delivered by Justice Lang-Miers,
Justices Francis and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellees Richard M. Cheatham, Tsar Energy, LLC, Tsar-Blue,
LLC and Tsar-WV, LLC recover their costs of this appeal from appellants BV Energy Partners,
LP and BV Real Estate Management, Inc.

Judgment entered this 12th day of May, 2015.

–14–